GOLDBERG, COMMISSIONER OF SOCIAL
SERVICES OF THE CITY OF NEW
YORK *v.* KELLY ET AL.

No. 62. Argued October 13, 1969—Decided March 23, 1970

*John J. Loflin, Jr.,* argued the cause for appellant. With him on the briefs were *J. Lee Rankin* and *Stanley Buchsbaum.*

*Lee A. Albert* argued the cause for appellees. With him on the brief were *Robert Borsody, Martin Garbus,* and *David Diamond.*

Briefs of *amici curiae* were filed by *Solicitor General Griswold, Assistant Attorney General Ruckelshaus,* and *Robert V. Zener* for the United States, and by *Victor G. Rosenblum* and *Daniel Wm. Fessler* for the National Institute for Education in Law and Poverty.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision is whether a State that terminates public assistance payments to a particular recipient without affording him the opportunity for an evidentiary hearing prior to termination denies the recipient procedural due process in violation of the Due Process Clause of the Fourteenth Amendment.

This action was brought in the District Court for the Southern District of New York by residents of New

York City receiving financial aid under the federally assisted program of Aid to Families with Dependent Children (AFDC) or under New York State's general Home Relief program.[1] Their complaint alleged that the New York State and New York City officials administering these programs terminated, or were about to terminate, such aid without prior notice and hearing, thereby denying them due process of law.[2] At the time

---

[1] AFDC was established by the Social Security Act of 1935, 49 Stat. 627, as amended, 42 U. S. C. §§ 601–610 (1964 ed. and Supp. IV). It is a categorical assistance program supported by federal grants-in-aid but administered by the States according to regulations of the Secretary of Health, Education, and Welfare. See N. Y. Social Welfare Law §§ 343–362 (1966). We considered other aspects of AFDC in *King* v. *Smith*, 392 U. S. 309 (1968), and in *Shapiro* v. *Thompson*, 394 U. S. 618 (1969).

Home Relief is a general assistance program financed and administered solely by New York state and local governments. N. Y. Social Welfare Law §§ 157–165 (1966), since July 1, 1967, Social Services Law §§ 157–166. It assists any person unable to support himself or to secure support from other sources. *Id.*, § 158.

[2] Two suits were brought and consolidated in the District Court. The named plaintiffs were 20 in number, including intervenors. Fourteen had been or were about to be cut off from AFDC, and six from Home Relief. During the course of this litigation most, though not all, of the plaintiffs either received a "fair hearing" (see *infra*, at 259–260) or were restored to the rolls without a hearing. However, even in many of the cases where payments have been resumed, the underlying questions of eligibility that resulted in the bringing of this suit have not been resolved. For example, Mrs. Altagracia Guzman alleged that she was in danger of losing AFDC payments for failure to cooperate with the City Department of Social Services in suing her estranged husband. She contended that the departmental policy requiring such cooperation was inapplicable to the facts of her case. The record shows that payments to Mrs. Guzman have not been terminated, but there is no indication that the basic dispute over her duty to cooperate has been resolved, or that the alleged danger of termination has been removed. Home Relief payments to Juan DeJesus were terminated because he refused to accept counseling and rehabilitation for drug addiction. Mr. DeJesus maintains that he

the suits were filed there was no requirement of prior notice or hearing of any kind before termination of financial aid. However, the State and city adopted procedures for notice and hearing after the suits were brought, and the plaintiffs, appellees here, then challenged the constitutional adequacy of those procedures.

The State Commissioner of Social Services amended the State Department of Social Services' Official Regulations to require that local social services officials proposing to discontinue or suspend a recipient's financial aid do so according to a procedure that conforms to either subdivision (a) or subdivision (b) of § 351.26 of the regulations as amended.[3] The City of New York

does not use drugs. His payments were restored the day after his complaint was filed. But there is nothing in the record to indicate that the underlying factual dispute in his case has been settled.

[3] The adoption in February 1968 and the amendment in April of Regulation § 351.26 coincided with or followed several revisions by the Department of Health, Education, and Welfare of its regulations implementing 42 U. S. C. § 602 (a)(4), which is the provision of the Social Security Act that requires a State to afford a "fair hearing" to any recipient of aid under a federally assisted program before termination of his aid becomes final. This requirement is satisfied by a post-termination "fair hearing" under regulations presently in effect. See HEW Handbook of Public Assistance Administration (hereafter HEW Handbook), pt. IV, §§ 6200–6400. A new HEW regulation, 34 Fed. Reg. 1144 (1969), now scheduled to take effect in July 1970, 34 Fed. Reg. 13595 (1969), would require continuation of AFDC payments until the final decision after a "fair hearing" and would give recipients a right to appointed counsel at "fair hearings." 45 CFR § 205.10, 34 Fed. Reg. 1144 (1969); 45 CFR § 220.25, 34 Fed. Reg. 1356 (1969). For the safeguards specified at such "fair hearings" see HEW Handbook, pt. IV, §§ 6200–6400. Another recent regulation now in effect requires a local agency administering AFDC to give "advance notice of questions it has about an individual's eligibility so that a recipient has an opportunity to discuss his situation before receiving formal written notice of reduction in payment or termination of assistance." Id., pt. IV, § 2300 (d)(5). This case presents no issue of the validity or con-

elected to promulgate a local procedure according to sub-division (b). That subdivision, so far as here pertinent, provides that the local procedure must include the giving of notice to the recipient of the reasons for a proposed discontinuance or suspension at least seven days prior to its effective date, with notice also that upon request the recipient may have the proposal reviewed by a local welfare official holding a position superior to that of the supervisor who approved the proposed discontinuance or suspension, and, further, that the recipient may submit, for purposes of the review, a written statement to demonstrate why his grant should not be discontinued or suspended. The decision by the reviewing official whether to discontinue or suspend aid must be made expeditiously, with written notice of the decision to the recipient. The section further expressly provides that "[a]ssistance shall not be discontinued or suspended prior to the date such notice of decision is sent to the recipient and his representative, if any, or prior to the proposed effective date of discontinuance or suspension, whichever occurs later."

Pursuant to subdivision (b), the New York City Department of Social Services promulgated Procedure No. 68–18. A caseworker who has doubts about the recipient's continued eligibility must first discuss them with the recipient. If the caseworker concludes that the recipient is no longer eligible, he recommends termination

struction of the federal regulations. It is only subdivision (b) of § 351.26 of the New York State regulations and implementing procedure 68–18 of New York City that pose the constitutional question before us. Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 641 (1969). Even assuming that the constitutional question might be avoided in the context of AFDC by construction of the Social Security Act or of the present federal regulations thereunder, or by waiting for the new regulations to become effective, the question must be faced and decided in the context of New York's Home Relief program, to which the procedures also apply.

of aid to a unit supervisor. If the latter concurs, he sends the recipient a letter stating the reasons for proposing to terminate aid and notifying him that within seven days he may request that a higher official review the record, and may support the request with a written statement prepared personally or with the aid of an attorney or other person. If the reviewing official affirms the determination of ineligibility, aid is stopped immediately and the recipient is informed by letter of the reasons for the action. Appellees' challenge to this procedure emphasizes the absence of any provisions for the personal appearance of the recipient before the reviewing official, for oral presentation of evidence, and for confrontation and cross-examination of adverse witnesses.[4] However, the letter does inform the recipient that he may request a post-termination "fair hearing." [5] This is a proceeding before an inde-

_____

[4] These omissions contrast with the provisions of subdivision (a) of § 351.26, the validity of which is not at issue in this Court. That subdivision also requires written notification to the recipient at least seven days prior to the proposed effective date of the reasons for the proposed discontinuance or suspension. However, the notification must further advise the recipient that if he makes a request therefor he will be afforded an opportunity to appear at a time and place indicated before the official identified in the notice, who will review his case with him and allow him to present such written and oral evidence as the recipient may have to demonstrate why aid should not be discontinued or suspended. The District Court assumed that subdivision (a) would be construed to afford rights of confrontation and cross-examination and a decision based solely on the record. 294 F. Supp. 893, 906–907 (1968).

[5] N. Y. Social Welfare Law § 353 (2) (1966) provides for a post-termination "fair hearing" pursuant to 42 U. S. C. § 602 (a) (4). See n. 3, *supra*. Although the District Court noted that HEW had raised some objections to the New York "fair hearing" procedures, 294 F. Supp., at 898 n. 9, these objections are not at issue in this Court. Shortly before this suit was filed, New York State adopted a similar provision for a "fair hearing" in ter-

pendent state hearing officer at which the recipient may appear personally, offer oral evidence, confront and cross-examine the witnesses against him, and have a record made of the hearing. If the recipient prevails at the "fair hearing" he is paid all funds erroneously withheld.[6] HEW Handbook, pt. IV, §§ 6200–6500; 18 NYCRR §§ 84.2–84.23. A recipient whose aid is not restored by a "fair hearing" decision may have judicial review. N. Y. Civil Practice Law and Rules, Art. 78 (1963). The recipient is so notified, 18 NYCRR § 84.16.

I

The constitutional issue to be decided, therefore, is the narrow one whether the Due Process Clause requires that the recipient be afforded an evidentiary hearing *before* the termination of benefits.[7] The District Court held

minations of Home Relief. 18 NYCRR §§ 84.2–84.23. In both AFDC and Home Relief the "fair hearing" must be held within 10 working days of the request, § 84.6, with decision within 12 working days thereafter, § 84.15. It was conceded in oral argument that these time limits are not in fact observed.

[6] Current HEW regulations require the States to make full retroactive payments (with federal matching funds) whenever a "fair hearing" results in a reversal of a termination of assistance. HEW Handbook, pt. IV, §§ 6200 (k), 6300 (g), 6500 (a); see 18 NYCRR § 358.8. Under New York State regulations retroactive payments can also be made, with certain limitations, to correct an erroneous termination discovered before a "fair hearing" has been held. 18 NYCRR § 351.27. HEW regulations also authorize, but do not require, the States to continue AFDC payments without loss of federal matching funds pending completion of a "fair hearing." HEW Handbook, pt. IV, § 6500 (b). The new HEW regulations presently scheduled to become effective July 1, 1970, will supersede all of these provisions. See n. 3, *supra.*

[7] Appellant does not question the recipient's due process right to evidentiary review *after* termination. For a general discussion of the provision of an evidentiary hearing prior to termination, see Comment, The Constitutional Minimum for the Termination of Welfare Benefits: The Need for and Requirements of a Prior Hearing, 68 Mich. L. Rev. 112 (1969).

that only a pre-termination evidentiary hearing would satisfy the constitutional command, and rejected the argument of the state and city officials that the combination of the post-termination "fair hearing" with the informal pre-termination review disposed of all due process claims. The court said: "While post-termination review is relevant, there is one overpowering fact which controls here. By hypothesis, a welfare recipient is destitute, without funds or assets. . . . Suffice it to say that to cut off a welfare recipient in the face of . . . 'brutal need' without a prior hearing of some sort is unconscionable, unless overwhelming considerations justify it." *Kelly* v. *Wyman,* 294 F. Supp. 893, 899, 900 (1968). The court rejected the argument that the need to protect the public's tax revenues supplied the requisite "overwhelming consideration." "Against the justified desire to protect public funds must be weighed the individual's overpowering need in this unique situation not to be wrongfully deprived of assistance . . . . While the problem of additional expense must be kept in mind, it does not justify denying a hearing meeting the ordinary standards of due process. Under all the circumstances, we hold that due process requires an adequate hearing before termination of welfare benefits, and the fact that there is a later constitutionally fair proceeding does not alter the result." *Id.,* at 901. Although state officials were party defendants in the action, only the Commissioner of Social Services of the City of New York appealed. We noted probable jurisdiction, 394 U. S. 971 (1969), to decide important issues that have been the subject of disagreement in principle between the three-judge court in the present case and that convened in *Wheeler* v. *Montgomery,* No. 14, *post,* p. 280, also decided today. We affirm.

Appellant does not contend that procedural due process is not applicable to the termination of welfare bene-

fits. Such benefits are a matter of statutory entitlement for persons qualified to receive them.[8] Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are "a 'privilege' and not a 'right.'" *Shapiro* v. *Thompson,* 394 U. S. 618, 627 n. 6 (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, *Sherbert* v. *Verner,* 374 U. S. 398 (1963); or to denial of a tax exemption, *Speiser* v. *Randall,* 357 U. S. 513 (1958); or to discharge from public employment, *Slochower* v. *Board of Higher Education,* 350 U. S. 551 (1956).[9] The extent to which procedural due process

---

[8] It may be realistic today to regard welfare entitlements as more like "property" than a "gratuity." Much of the existing wealth in this country takes the form of rights that do not fall within traditional common-law concepts of property. It has been aptly noted that

"[s]ociety today is built around entitlement. The automobile dealer has his franchise, the doctor and lawyer their professional licenses, the worker his union membership, contract, and pension rights, the executive his contract and stock options; all are devices to aid security and independence. Many of the most important of these entitlements now flow from government: subsidies to farmers and businessmen, routes for airlines and channels for television stations; long term contracts for defense, space, and education; social security pensions for individuals. Such sources of security, whether private or public, are no longer regarded as luxuries or gratuities; to the recipients they are essentials, fully deserved, and in no sense a form of charity. It is only the poor whose entitlements, although recognized by public policy, have not been effectively enforced." Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L. J. 1245, 1255 (1965). See also Reich, The New Property, 73 Yale L. J. 733 (1964).

[9] See also *Goldsmith* v. *United States Board of Tax Appeals,* 270 U. S. 117 (1926) (right of a certified public accountant to practice before the Board of Tax Appeals); *Hornsby* v. *Allen,* 326 F. 2d 605

must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss," *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in *Cafeteria & Restaurant Workers Union* v. *McElroy*, 367 U. S. 886, 895 (1961), "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." See also *Hannah* v. *Larche*, 363 U. S. 420, 440, 442 (1960).

It is true, of course, that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing.[10]

---

(C. A. 5th Cir. 1964) (right to obtain a retail liquor store license); *Dixon* v. *Alabama State Board of Education*, 294 F. 2d 150 (C. A. 5th Cir.), cert. denied, 368 U. S. 930 (1961) (right to attend a public college).

[10] One Court of Appeals has stated: "In a wide variety of situations, it has long been recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing." *R. A. Holman & Co.* v. *SEC*, 112 U. S. App. D. C. 43, 47, 299 F. 2d 127, 131, cert. denied, 370 U. S. 911 (1962) (suspension of exemption from stock registration requirement). See also, for example, *Ewing* v. *Mytinger & Casselberry, Inc.*, 339 U. S. 594 (1950) (seizure of mislabeled vitamin product); *North American Cold Storage Co.* v. *Chicago*, 211 U. S. 306 (1908) (seizure of food not fit for human use); *Yakus* v. *United States*, 321 U. S. 414 (1944) (adoption of wartime price regulations); *Gonzalez* v. *Freeman*, 118 U. S. App. D. C. 180, 334 F. 2d 570 (1964) (disqualification of a contractor to do business with the Government). In *Cafeteria & Restaurant Workers Union* v. *McElroy*, supra, at 896, summary dismissal of a public employee was upheld

But we agree with the District Court that when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process. Cf. *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969). For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care.[11] Cf. *Nash* v. *Florida Industrial Commission*, 389 U. S. 235, 239 (1967). Thus the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.[12]

Moreover, important governmental interests are promoted by affording recipients a pre-termination evidentiary hearing. From its founding the Nation's basic

---

because "[i]n [its] proprietary military capacity, the Federal Government . . . has traditionally exercised unfettered control," and because the case involved the Government's "dispatch of its own internal affairs." Cf. *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113 (1940).

[11] Administrative determination that a person is ineligible for welfare may also render him ineligible for participation in state-financed medical programs. See N. Y. Social Welfare Law § 366 (1966).

[12] His impaired adversary position is particularly telling in light of the welfare bureaucracy's difficulties in reaching correct decisions on eligibility. See Comment, Due Process and the Right to a Prior Hearing in Welfare Cases, 37 Ford. L. Rev. 604, 610–611 (1969).

commitment has been to foster the dignity and well-being of all persons within its borders. We have come to recognize that forces not within the control of the poor contribute to their poverty.[13] This perception, against the background of our traditions, has significantly influenced the development of the contemporary public assistance system. Welfare, by meeting the basic demands of subsistence, can help bring within the reach of the poor the same opportunities that are available to others to participate meaningfully in the life of the community. At the same time, welfare guards against the societal malaise that may flow from a widespread sense of unjustified frustration and insecurity. Public assistance, then, is not mere charity, but a means to "promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity." The same governmental interests that counsel the provision of welfare, counsel as well its uninterrupted provision to those eligible to receive it; pre-termination evidentiary hearings are indispensable to that end.

Appellant does not challenge the force of these considerations but argues that they are outweighed by countervailing governmental interests in conserving fiscal and administrative resources. These interests, the argument goes, justify the delay of any evidentiary hearing until after discontinuance of the grants. Summary adjudication protects the public fisc by stopping payments promptly upon discovery of reason to believe that a recipient is no longer eligible. Since most terminations are accepted without challenge, summary adjudication also conserves both the fisc and administrative time and energy by reducing the number of evidentiary hearings actually held.

---

[13] See, e. g., Reich, *supra,* n. 8, 74 Yale L. J., at 1255.

We agree with the District Court, however, that these governmental interests are not overriding in the welfare context. The requirement of a prior hearing doubtless involves some greater expense, and the benefits paid to ineligible recipients pending decision at the hearing probably cannot be recouped, since these recipients are likely to be judgment-proof. But the State is not without weapons to minimize these increased costs. Much of the drain on fiscal and administrative resources can be reduced by developing procedures for prompt pre-termination hearings and by skillful use of personnel and facilities. Indeed, the very provision for a post-termination evidentiary hearing in New York's Home Relief program is itself cogent evidence that the State recognizes the primacy of the public interest in correct eligibility determinations and therefore in the provision of procedural safeguards. Thus, the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens. As the District Court correctly concluded, "[t]he stakes are simply too high for the welfare recipient, and the possibility for honest error or irritable misjudgment too great, to allow termination of aid without giving the recipient a chance, if he so desires, to be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal." 294 F. Supp., at 904–905.

## II

We also agree with the District Court, however, that the pre-termination hearing need not take the form of a judicial or quasi-judicial trial. We bear in mind that the statutory "fair hearing" will provide the recipient

with a full administrative review.[14] Accordingly, the pre-termination hearing has one function only: to produce an initial determination of the validity of the welfare department's grounds for discontinuance of payments in order to protect a recipient against an erroneous termination of his benefits. Cf. *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337, 343 (1969) (HARLAN, J., concurring). Thus, a complete record and a comprehensive opinion, which would serve primarily to facilitate judicial review and to guide future decisions, need not be provided at the pre-termination stage. We recognize, too, that both welfare authorities and recipients have an interest in relatively speedy resolution of questions of eligibility, that they are used to dealing with one another informally, and that some welfare departments have very burdensome caseloads. These considerations justify the limitation of the pre-termination hearing to minimum procedural safeguards, adapted to the particular characteristics of welfare recipients, and to the limited nature of the controversies to be resolved. We wish to add that we, no less than the dissenters, recognize the importance of not imposing upon the States or the Federal Government in this developing field of law any procedural requirements beyond those demanded by rudimentary due process.

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914). The hearing must be "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). In the present context these principles require that a recipient have timely and adequate notice detailing the reasons for a

---

[14] Due process does not, of course, require two hearings. If, for example, a State simply wishes to continue benefits until after a "fair" hearing there will be no need for a preliminary hearing.

proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally. These rights are important in cases such as those before us, where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases.[15]

We are not prepared to say that the seven-day notice currently provided by New York City is constitutionally insufficient *per se*, although there may be cases where fairness would require that a longer time be given. Nor do we see any constitutional deficiency in the content or form of the notice. New York employs both a letter and a personal conference with a caseworker to inform a recipient of the precise questions raised about his continued eligibility. Evidently the recipient is told the legal and factual bases for the Department's doubts. This combination is probably the most effective method of communicating with recipients.

The city's procedures presently do not permit recipients to appear personally with or without counsel before the official who finally determines continued eligibility. Thus a recipient is not permitted to present evidence to that official orally, or to confront or cross-examine adverse witnesses. These omissions are fatal to the constitutional adequacy of the procedures.

The opportunity to be heard must be tailored to the

---

[15] This case presents no question requiring our determination whether due process requires only an opportunity for written submission, or an opportunity both for written submission and oral argument, where there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues. See *FCC* v. *WJR*, 337 U. S. 265, 275–277 (1949).

capacities and circumstances of those who are to be heard.[16]  It is not enough that a welfare recipient may present his position to the decision maker in writing or secondhand through his caseworker.  Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance. Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important.  Particularly where credibility and veracity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision.  The secondhand presentation to the decisionmaker by the caseworker has its own deficiencies; since the caseworker usually gathers the facts upon which the charge of ineligibility rests, the presentation of the recipient's side of the controversy cannot safely be left to him.  Therefore a recipient must be allowed to state his position orally.  Informal procedures will suffice; in this context due process does not require a particular order of proof or mode of offering evidence.  Cf. HEW Handbook, pt. IV, § 6400 (a).

In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. E. g., ICC v. Louisville & N. R. Co., 227 U. S. 88, 93–94 (1913); Willner v. Committee on Character & Fitness, 373 U. S. 96, 103–104 (1963).  What we said in

---

[16] "[T]he prosecution of an appeal demands a degree of security, awareness, tenacity, and ability which few dependent people have." Wedemeyer & Moore, The American Welfare System, 54 Calif. L. Rev. 326, 342 (1966).

*Greene* v. *McElroy*, 360 U. S. 474, 496–497 (1959), is particularly pertinent here:

> "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment . . . . This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, . . . but also in all types of cases where administrative . . . actions were under scrutiny."

Welfare recipients must therefore be given an opportunity to confront and cross-examine the witnesses relied on by the department.

"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell* v. *Alabama*, 287 U. S. 45, 68–69 (1932). We do not say that counsel must be provided at the pre-termination hearing, but only that the recipient must be allowed to retain an attorney if he so desires. Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the

interests of the recipient. We do not anticipate that this assistance will unduly prolong or otherwise encumber the hearing. Evidently HEW has reached the same conclusion. See 45 CFR § 205.10, 34 Fed. Reg. 1144 (1969); 45 CFR § 220.25, 34 Fed. Reg. 13595 (1969).

Finally, the decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing. *Ohio Bell Tel. Co.* v. *PUC*, 301 U. S. 292 (1937); *United States* v. *Abilene & S. R. Co.*, 265 U. S. 274, 288–289 (1924). To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on, cf. *Wichita R. & Light Co.* v. *PUC*, 260 U. S. 48, 57–59 (1922), though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law. And, of course, an impartial decision maker is essential. Cf. *In re Murchison*, 349 U. S. 133 (1955); *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 45–46 (1950). We agree with the District Court that prior involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decision maker. He should not, however, have participated in making the determination under review.

*Affirmed.*

[For dissenting opinion of MR. CHIEF JUSTICE BURGER, see *post*, p. 282.]

[For dissenting opinion of MR. JUSTICE STEWART, see *post*, p. 285.]

MR. JUSTICE BLACK, dissenting.

In the last half century the United States, along with many, perhaps most, other nations of the world, has moved far toward becoming a welfare state, that is, a nation that for one reason or another taxes its most

affluent people to help support, feed, clothe, and shelter its less fortunate citizens. The result is that today more than nine million men, women, and children in the United States receive some kind of state or federally financed public assistance in the form of allowances or gratuities, generally paid them periodically, usually by the week, month, or quarter.[1] Since these gratuities are paid on the basis of need, the list of recipients is not static, and some people go off the lists and others are added from time to time. These ever-changing lists put a constant administrative burden on government and it certainly could not have reasonably anticipated that this burden would include the additional procedural expense imposed by the Court today.

The dilemma of the ever-increasing poor in the midst of constantly growing affluence presses upon us and must inevitably be met within the framework of our democratic constitutional government, if our system is to survive as such. It was largely to escape just such pressing economic problems and attendant government repression that people from Europe, Asia, and other areas settled this country and formed our Nation. Many of those settlers had personally suffered from persecutions of various kinds and wanted to get away from governments that had unrestrained powers to make life miserable for their citizens. It was for this reason, or so I believe, that on reaching these new lands the early settlers undertook to curb their governments by confining their powers

---

[1] This figure includes all recipients of Old-age Assistance, Aid to Families with Dependent Children, Aid to the Blind, Aid to the Permanently and Totally Disabled, and general assistance. In this case appellants are AFDC and general assistance recipients. In New York State alone there are 951,000 AFDC recipients and 108,000 on general assistance. In the Nation as a whole the comparable figures are 6,080,000 and 391,000. U. S. Bureau of the Census, Statistical Abstract of the United States: 1969 (90th ed.), Table 435, p. 297.

within written boundaries, which eventually became written constitutions.[2] They wrote their basic charters as nearly as men's collective wisdom could do so as to proclaim to their people and their officials an emphatic command that: "Thus far and no farther shall you go; and where we neither delegate powers to you, nor prohibit your exercise of them, we the people are left free." [3]

Representatives of the people of the Thirteen Original Colonies spent long, hot months in the summer of 1787 in Philadelphia, Pennsylvania, creating a government of limited powers. They divided it into three departments—Legislative, Judicial, and Executive. The Judicial Department was to have no part whatever in making any laws. In fact proposals looking to vesting some power in the Judiciary to take part in the legislative process and veto laws were offered, considered, and rejected by the Constitutional Convention.[4] In my

---

[2] The goal of a written constitution with fixed limits on governmental power had long been desired. Prior to our colonial constitutions, the closest man had come to realizing this goal was the political movement of the Levellers in England in the 1640's. J. Frank, The Levellers (1955). In 1647 the Levellers proposed the adoption of An Agreement of the People which set forth written limitations on the English Government. This proposal contained many of the ideas which later were incorporated in the constitutions of this Nation. *Id.*, at 135–147.

[3] This command is expressed in the Tenth Amendment:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

[4] It was proposed that members of the judicial branch would sit on a Council of Revision which would consider legislation and have the power to veto it. This proposal was rejected. J. Elliot, 1 Elliot's Debates 160, 164, 214 (Journal of the Federal Convention); 395, 398 (Yates' Minutes); vol. 5, pp. 151, 164–166, 344–349 (Madison's Notes) (Lippincott ed. 1876). It was also suggested that The Chief Justice would serve as a member of the President's executive council, but this proposal was similarly rejected. *Id.*, vol. 5, pp. 442, 445, 446, 462.

judgment there is not one word, phrase, or sentence from the beginning to the end of the Constitution from which it can be inferred that judges were granted any such legislative power. True, *Marbury v. Madison,* 1 Cranch 137 (1803), held, and properly, I think, that courts must be the final interpreters of the Constitution, and I recognize that the holding can provide an opportunity to slide imperceptibly into constitutional amendment and law making. But when federal judges use this judicial power for legislative purposes, I think they wander out of their field of vested powers and transgress into the area constitutionally assigned to the Congress and the people. That is precisely what I believe the Court is doing in this case. Hence my dissent.

The more than a million names on the relief rolls in New York,[5] and the more than nine million names on the rolls of all the 50 States were not put there at random. The names are there because state welfare officials believed that those people were eligible for assistance. Probably in the officials' haste to make out the lists many names were put there erroneously in order to alleviate immediate suffering, and undoubtedly some people are drawing relief who are not entitled under the law to do so. Doubtless some draw relief checks from time to time who know they are not eligible, either because they are not actually in need or for some other reason. Many of those who thus draw undeserved gratuities are without sufficient property to enable the government to collect back from them any money they wrongfully receive. But the Court today holds that it would violate the Due Process Clause of the Fourteenth Amendment to stop paying those people weekly or monthly allowances unless the government first affords them a full "evidentiary hearing" even

---

[5] See n. 1, *supra.*

though welfare officials are persuaded that the recipients are not rightfully entitled to receive a penny under the law. In other words, although some recipients might be on the lists for payment wholly because of deliberate fraud on their part, the Court holds that the government is helpless and must continue, until after an evidentiary hearing, to pay money that it does not owe, never has owed, and never could owe. I do not believe there is any provision in our Constitution that should thus paralyze the government's efforts to protect itself against making payments to people who are not entitled to them.

Particularly do I not think that the Fourteenth Amendment should be given such an unnecessarily broad construction. That Amendment came into being primarily to protect Negroes from discrimination, and while some of its language can and does protect others, all know that the chief purpose behind it was to protect ex-slaves. Cf. *Adamson* v. *California,* 332 U. S. 46, 71–72, and n. 5 (1947) (dissenting opinion). The Court, however, relies upon the Fourteenth Amendment and in effect says that failure of the government to pay a promised charitable instalment to an individual deprives that individual of *his own property,* in violation of the Due Process Clause of the Fourteenth Amendment. It somewhat strains credulity to say that the government's promise of charity to an individual is property belonging to that individual when the government denies that the individual is honestly entitled to receive such a payment.

I would have little, if any, objection to the majority's decision in this case if it were written as the report of the House Committee on Education and Labor, but as an opinion ostensibly resting on the language of the Constitution I find it woefully deficient. Once the verbiage is pared away it is obvious that this Court today adopts the views of the District Court "that to cut off a welfare recipient in the face of . . . 'brutal need' without a prior

hearing of some sort is unconscionable," and therefore, says the Court, unconstitutional. The majority reaches this result by a process of weighing "the recipient's interest in avoiding" the termination of welfare benefits against "the governmental interest in summary adjudication." *Ante,* at 263. Today's balancing act requires a "pre-termination evidentiary hearing," yet there is nothing that indicates what tomorrow's balance will be. Although the majority attempts to bolster its decision with limited quotations from prior cases, it is obvious that today's result does not depend on the language of the Constitution itself or the principles of other decisions, but solely on the collective judgment of the majority as to what would be a fair and humane procedure in this case.

This decision is thus only another variant of the view often expressed by some members of this Court that the Due Process Clause forbids any conduct that a majority of the Court believes "unfair," "indecent," or "shocking to their consciences." See, *e. g., Rochin* v. *California,* 342 U. S. 165, 172 (1952). Neither these words nor any like them appear anywhere in the Due Process Clause. If they did, they would leave the majority of Justices free to hold any conduct unconstitutional that they should conclude on their own to be unfair or shocking to them.[6] Had the drafters of the Due Process Clause meant to leave judges such ambulatory power to declare

---

[6] I am aware that some feel that the process employed in reaching today's decision is not dependent on the individual views of the Justices involved, but is a mere objective search for the "collective conscience of mankind," but in my view that description is only a euphemism for an individual's judgment. Judges are as human as anyone and as likely as others to see the world through their own eyes and find the "collective conscience" remarkably similar to their own. Cf. *Griswold* v. *Connecticut,* 381 U. S. 479, 518–519 (1965) (BLACK, J., dissenting); *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337, 350–351 (1969) (BLACK, J., dissenting).

laws unconstitutional, the chief value of a written constitution, as the Founders saw it, would have been lost. In fact, if that view of due process is correct, the Due Process Clause could easily swallow up all other parts of the Constitution. And truly the Constitution would always be "what the judges say it is" at a given moment, not what the Founders wrote into the document.[7] A written constitution, designed to guarantee protection against governmental abuses, including those of judges, must have written standards that mean something definite and have an explicit content. I regret very much to be compelled to say that the Court today makes a drastic and dangerous departure from a Constitution written to control and limit the government and the judges and moves toward a constitution designed to be no more and no less than what the judges of a particular social and economic philosophy declare on the one hand to be fair or on the other hand to be shocking and unconscionable.

The procedure required today as a matter of constitutional law finds no precedent in our legal system. Reduced to its simplest terms, the problem in this case is similar to that frequently encountered when two parties have an ongoing legal relationship that requires one party to make periodic payments to the other. Often the situation arises where the party "owing" the money stops paying it and justifies his conduct by arguing that the recipient is not legally entitled to payment. The recipient can, of course, disagree and go to court to compel payment. But I know of no situation in our legal system in which the person alleged to owe money to

---

[7] To realize how uncertain a standard of "fundamental fairness" would be, one has only to reflect for a moment on the possible disagreement if the "fairness" of the procedure in this case were propounded to the head of the National Welfare Rights Organization, the president of the national Chamber of Commerce, and the chairman of the John Birch Society.

another is required by law to continue making payments to a judgment-proof claimant without the benefit of any security or bond to insure that these payments can be recovered if he wins his legal argument. Yet today's decision in no way obligates the welfare recipient to pay back any benefits wrongfully received during the pre-termination evidentiary hearings or post any bond, and in all "fairness" it could not do so. These recipients are by definition too poor to post a bond or to repay the benefits that, as the majority assumes, must be spent as received to insure survival.

The Court apparently feels that this decision will benefit the poor and needy. In my judgment the eventual result will be just the opposite. While today's decision requires only an administrative, evidentiary hearing, the inevitable logic of the approach taken will lead to constitutionally imposed, time-consuming delays of a full adversary process of administrative and judicial review. In the next case the welfare recipients are bound to argue that cutting off benefits before judicial review of the agency's decision is also a denial of due process. Since, by hypothesis, termination of aid at that point may still "deprive an *eligible* recipient of the very means by which to live while he waits," *ante*, at 264, I would be surprised if the weighing process did not compel the conclusion that termination without full judicial review would be unconscionable. After all, at each step, as the majority seems to feel, the issue is only one of weighing the government's pocketbook against the actual survival of the recipient, and surely that balance must always tip in favor of the individual. Similarly today's decision requires only the opportunity to have the benefit of counsel at the administrative hearing, but it is difficult to believe that the same reasoning process would not require the appointment of counsel, for otherwise the right to counsel is a meaningless one since these

people are too poor to hire their own advocates. Cf. *Gideon* v. *Wainwright*, 372 U. S. 335, 344 (1963). Thus the end result of today's decision may well be that the government, once it decides to give welfare benefits, cannot reverse that decision until the recipient has had the benefits of full administrative and judicial review, including, of course, the opportunity to present his case to this Court. Since this process will usually entail a delay of several years, the inevitable result of such a constitutionally imposed burden will be that the government will not put a claimant on the rolls initially until it has made an exhaustive investigation to determine his eligibility. While this Court will perhaps have insured that no needy person will be taken off the rolls without a full "due process" proceeding, it will also have insured that many will never get on the rolls, or at least that they will remain destitute during the lengthy proceedings followed to determine initial eligibility.

For the foregoing reasons I dissent from the Court's holding. The operation of a welfare state is a new experiment for our Nation. For this reason, among others, I feel that new experiments in carrying out a welfare program should not be frozen into our constitutional structure. They should be left, as are other legislative determinations, to the Congress and the legislatures that the people elect to make our laws.