**Catherine EASLEY, et al., Plaintiffs,**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, DIVISION OF SOCIAL SERVICES, et al., Defendants.**

**No. PB–C–84–469.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Oct. 21, 1986.

Ben Johnson, Jr., Jan Dewoody Scussel, Legal Services of Arkansas, Monticello, Ark., for plaintiffs.

E. Jeffery Story, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROY, District Judge.

This matter comes before the Court on briefs and stipulations of the parties. The parties agreed that the only issues to be decided were legal issues, and therefore agreed to submit the case on briefs. The Court makes the following findings of fact and conclusions of law, which incorporate the stipulations entered into by the parties.

### FINDINGS OF FACT

1. Plaintiffs Catherine Easley, Bessie Jenkins, Carolyn Johnson, Mary Matthews and Alice Smith were Medicaid recipients pursuant to Title XIX of the Social Security Act at the time the case at bar was filed (42 U.S.C. § 1396 et seq.). Mary Matthews and Alice Smith continue to be Medicaid recipients.

2. Defendant, Arkansas Department of Human Services, Division of Social Services, is a State agency and Defendants, Ray Scott, Walt Patterson and Ray Hanley, are the state officials responsible for administering the Medicaid program within the State of Arkansas. (Hereinafter referred to as "Department".) The Division of Social Services has been renamed Division of Economic and Medical Services. Curtis Ivery and Kenny Whitlock have been succeeded by Walt Patterson and Ray Hanley.

3. The present lawsuit results from the denial of payment on claims submitted by providers for each of the plaintiffs. In the plaintiffs' cases, Medicaid providers sought payment for the treatment of plaintiffs from the defendant Department by filing requests for payment. In the case of each plaintiff, the request for payment filed by the Medicaid provider was denied in whole or in part because of the providers' failure to comply with the procedural requirements of Arkansas Medicaid or because the service rendered was not covered by Medicaid. The Medicaid providers did not attempt to timely refile corrected requests for payment subsequent to the defendant Department's informing them of their procedural or clerical mistakes.

4. Medicaid is a welfare program in which states that choose to participate work with the federal government to provide medical assistance to eligible individuals. It is a cooperative federal and state cost-sharing venture in which participating states must submit a plan to the Secretary of Health and Human Services for approval and must comply with all federal statutes and regulations governing the Medicaid program. Once its plan is approved, the state agency responsible for administering the program has authority to contract with public and private medical providers relative to the rendition of medical services to eligible Medicaid recipients.

5. In Arkansas there are four types of individuals who are eligible for Medicaid benefits. Low-income individuals who qualify for Supplemental Security Income or Aid to Families with Dependent Children automatically qualify for Medicaid benefits. In addition, foster children and other medically needy individuals may be eligible for benefits. Arkansans may be determined eligible for Medicaid benefits as "categorically needy" if they meet the categorical requirements for Supplemental Security Income or Aid to Families with Dependent Children but are ineligible for those two welfare programs because of their income or assets. (42 U.S.C. § 1396d(a)).

Once an individual is determined eligible for Medicaid benefits, he or she is issued a Medicaid card. When a Medicaid card is presented and accepted by a medical provider who has contracted with Arkansas Medicaid, the provider is obligated to render medical services to the Medicaid recipient and seek payment for those services from Arkansas Medicaid. The provider is also obligated to follow policy and procedural requirements. When a physician, hospital, or other medical provider contracts with Arkansas Medicaid, a Provider's Manual is furnished the provider which outlines the procedures for securing payment for medical services rendered and otherwise complying with Medicaid regulations. When a Medicaid provider seeks payment from the defendant Department, a request for payment is filed specifically delineating the date(s) and nature of the medical services rendered. As a general rule, a Request for Payment will be denied by defendant Department unless the Medicaid provider submits the request within six (6) months from the date the medical services were rendered.

6. The various circumstances under which the defendant Department denies a Medicaid provider's request for payment are:

(a) *Prior Authorization.* The Department has developed policies that require a provider to seek prior approval for certain listed surgical treatment prior to actually performing surgery. The basis for denying prior authorization is that the anticipated surgery is not medically necessary.

(b) *Non-Covered Services.* Requests for payments will be denied if the services are not covered within the scope of the program. For example, if prior authorization

is denied for a particular surgical procedure and the service is still rendered, request for payment will be denied as a non-covered service.

(c) *Lack of Medical Necessity.* In addition to denials of prior authorization, the Department will deny a request for payment if the services rendered were not medically necessary. The Department places a limit on the number of days a Medicaid recipient may stay in the hospital for a particular type of surgical treatment (e.g. tonsillectomy—three days in hospital). If a patient stays longer than the Department allows, the extra days will be considered not medically necessary unless the Medicaid provider proves otherwise.

(d) *Not Medicaid Eligible.* Requests for payments are denied when providers seek payment for services rendered to an individual who has not applied for Medicaid or who did not have a valid Medicaid card at the time the service was rendered.

(e) *Technical Denials.* If the Medicaid provider fails to correctly complete the request for payment form, the claim is denied. (e.g. wrong Medicaid I.D. number, incorrect diagnosis code).

7. Most of the plaintiffs herein or their children received medical treatment from Medicaid providers at a time at which they were determined eligible for Medicaid benefits. Others were eligible retroactively after medical services had been provided. More specifically, a brief statement of the facts of each plaintiff's case is as follows:

(a) Catherine Easley: Ms. Easley received a retroactive Medicaid card for the period of time she was hospitalized and treated for exogenous obesity and chronic obstructive pulmonary disease. Gastric by-pass surgery was performed during her period of Medicaid eligibility. According to defendant Department's regulations, a treating physician must obtain the approval of Arkansas Medicaid prior to performing gastric by-pass surgery. The request for payments filed by Plaintiff Easley's Medicaid providers were denied for failure to obtain prior approval.

(b) Bessie Jenkins: Ms. Jenkins was issued a retroactive Medicaid card for the period of time she was hospitalized and treated for cervical cancer. She provided copies of her Medicaid card to her treating physicians and hospitals. However, several of the requests for payments were denied for clerical or procedural errors made by the Medicaid providers.

(c) Carolyn Johnson: Plaintiff Johnson had a valid Medicaid card at the time she was hospitalized and treated for obstetrical care. However, the bulk of the medical bills incurred by her were not paid by defendant Department because the Medicaid providers made clerical errors in their requests for payment. Specifically, payment to Desha County Hospital was denied because "days billed [were] not equal to period covered by billing". Effective September 1, 1986, the provider may not hold recipients responsible for a bill when the provider has failed to submit the claim correctly. This is a technical denial and the foregoing policy is being made a part of the Providers' Manual. This policy was not in effect at the time of Ms. Johnson's treatment.

(d) Mary Matthews: Part of plaintiff Matthews' medical bills to the Ola Clinic were not paid by the defendant Department because of the Medicaid provider's failure to put the proper diagnosis code number on the request for payment. However, the Ola Clinic failed to refile a corrected request for payment and, as a result, plaintiff Matthews is faced with payment of the medical bills herself.

(e) Alice Smith: Desha County Hospital and Thomas Lewellan, M.D. submitted claims for payment of services for Felicia and Eli Gibson IV, Ms. Smith's daughter and son, in 1982. The hospital denied a $370.00 bill for recipient ineligibility. The claim had Eli's name on it, but Felicia's I.D. number. The claim could have been corrected and refiled with a copy of the Medicaid card any time within six months of the issue date, but was not refiled. Payment for certain services performed by Dr. Lewellan were denied based upon the fact that the recipients (Eli and Felicia) were

ineligible. No remedy on the part of the provider was possible for ineligibility.

8. At the time plaintiffs received medical services that are the subject of this lawsuit, recipients were not notified about the actual collection and payment process unless they contacted the Department. The recipients never received copies of the requests for payment sent to Medicaid by the providers nor did recipients receive notification of payment or non-payment from the defendant Department.

9. In this case, none of the plaintiffs were aware that the requests for payment were denied until they received notification from a collection agency or they were served with a summons and a complaint for the collection of unpaid medical bills.

10. As of July, 1985, the defendant Department adopted a policy of sending notice to recipients whose medical claims had been denied for lack of prior authorization. In that situation the recipient receives a copy of the letter sent to the medical provider denying the claim. The only instance in which the defendant notifies a Medicaid recipient of the opportunity to appeal the denial of a claim is where that claim has been denied for lack of prior authorization. As a part of defendant Department's audit procedure, there is another instance where recipients are contacted at random and asked *to verify* providers' statements. Four hundred recipients are contacted in this manner each quarter.

11. A recipient that challenges the denial of payment for a claim in prior authorization situations may request the initiation of the fair hearing process. Recipients such as plaintiffs have been forced to defend themselves in litigation filed by collection agencies to collect these unpaid medical bills.

12. Currently there are three (3) instances where a client may be notified about adverse action relative to his eligibility or Medicaid claim:

(a) The request for Medicaid eligibility is denied. The client has the right to appeal this determination.

(b) A Medicaid recipient's coverage of 18 outpatient visits are reduced to 12 per year. The client has the right to appeal this determination.

(c) Requests for prior authorization are denied for lack of medical necessity. The client has a right to appeal such a denial.

## CONCLUSIONS OF LAW

1. Plaintiffs argue that the notice sent to Medicaid recipients in prior authorization cases does not conform to law and neither does the policy amendment to the Provider's Manual effective September 1, 1986. It is defendants' position that due process is only required in those instances in which the effect of the state agency's denial of a request for payment is to render a recipient liable for the medical services covered by that request.

2. When a state voluntarily chooses to participate in the Medicaid program, as did the State of Arkansas, it is required to submit a state plan providing for granting an opportunity for a fair hearing when a Medicaid recipient's claim for medical assistance is denied or is not acted upon with reasonable promptness. 42 U.S.C. § 1396a(a)(3). Further, the State of Arkansas agreed to comply with federal regulations promulgated by the Health Care Financing Administration (HCFA) which governs the Medicaid program, subject to any appeal of those regulations that the state chooses to make. Federal regulations require the agency to grant an opportunity for a hearing to:

(1) Any applicant who requests it because his claim for services is denied or is not acted upon with reasonable promptness; and

(2) Any recipient who requests it because he believes the agency has taken an action erroneously.

42 C.F.R. § 431.220.

Federal regulations also prescribe procedures for an opportunity for hearing if the agency takes action to suspend, terminate, or reduce services. 42 C.F.R. § 431.200. The fair hearing system estab-

lished by the department must comply with the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (42 C.F.R. § 431.205(d)).

3. The Court does not find the defendants' limited interpretation to be supported by the applicable law. The relevant federal regulation states clearly that due process protections are to be afforded "to any person whose claim for assistance is denied ...". 42 C.F.R. § 431.200. HCFA interprets these federal regulations to require due process safeguards in only those situations where the denial of the requests for payment would render the recipient liable for the medical bill in question.

4. According to Ray Hanley, Assistant Deputy Director for Medical Services, on August 6, 1986, the Department wrote a letter to the Dallas Regional Office of the HCFA admitting that the Department was not in compliance with the HCFA interpretation with regard to giving notice and an opportunity to be heard in cases of non-covered services. The Department requested a waiver of the requirement in non-covered service cases, stating that the handbook given Medicaid recipients outlines all Medicaid services and benefit limits available, and that recipients are given a toll-free telephone number that they may call for inquiries.

5. The federal regulation contains no such language of limitation, and the Court finds that the handbook and toll-free number are not sufficient to satisfy due process. The Court is persuaded by the plaintiffs' position that recipients, as a general rule, are (1) unaware of the specific benefit limits or conditions of the Arkansas Medicaid program; (2) not actively involved in the actual collection or payment process; (3) never advised of disposition of their Medicaid claims for medical services rendered; and (4) not provided with sufficient information regarding what type of medical services they are responsible to pay themselves. Generally, according to the plaintiffs, recipients never know if medical bills have been paid unless they receive dun letters from Medicaid providers or collec-

tion agencies or are named as a defendant in a lawsuit for the collection of their medical bills. Even then, Medicaid recipients do not have meaningful access to pertinent State Medicaid policies to aid them in the determination of whether or not they are responsible for the medical bills in question.

6. Mr. Hanley stated that the handbook is issued to Medicaid recipients only one time—when they receive their first Medicaid card. As stated earlier, Aid to Families with Dependent Children and Supplemental Security Income recipients are automatically eligible for the Medicaid program. It is possible that these types of recipients could be on the Medicaid program for a period of several years and never receive a handbook. Mr. Hanley also admits that a Medicaid recipient may not have access to the handbook because it was lost or never received by the Medicaid recipient. More importantly, according to Mr. Hanley, the handbook does not explicitly delineate whether or not a particular medical service is covered or not by the Medicaid benefit package. Rather, it gives only a general overview. The handbook, obviously, does not constitute sufficient notice because Medicaid recipients receive these handbooks *prior* to ever seeking medical services. The provisions of 42 C.F.R. § 431.200 *et seq.*, require notice *after* a Medicaid recipient has received medical services under the Medicaid program and the provider's requests for payment is denied with regard to that service.

7. Nor is the Court persuaded that the toll-free number satisfies the due process requirements. Mr. Hanley stated that the toll-free number is only available to recipients and providers from 8:00 a.m. to 4:30 p.m. Monday through Friday. The defendants admit this toll-free number sometimes receives a thousand calls a week, is utilized primarily by Medicaid providers rather than recipients, is staffed by only 6 persons, and is primarily used to answer questions. If a recipient calls the toll-free number complaining that a Medicaid provider is attempting to collect a bill that the recipient thought was covered by Medicaid, the

Department initiates an investigation. If the Department determines that the recipient has a valid complaint, it so advises the Medicaid provider and the recipient. The Department takes no further steps to insure that the Medicaid provider ceases billing the Medicaid recipient. Although the provider could be sanctioned or suspended, Mr. Hanley stated that this has not been done. If the Department determines that the Medicaid recipient is being properly billed because it is a non-covered service, it will so advise the recipient by the phone or in writing without affording the recipient an opportunity to appeal. It is possible that the same people that made the initial decision not to pay the claim would also make the subsequent decision that the claim was properly denied.

8. The Court finds that the existence of the toll-free telephone number does not afford the Medicaid recipient the procedural due process safeguards contemplated by 42 C.F.R. § 431.200 *et seq.* and the United States Constitution. By the Department's own admission, it cannot legally force a collection agency to cease collection procedures even in cases in which the Medicaid policies clearly state that the recipient is not liable for the medical bill in question. It is the Department's position that, since it has no contract with the collection agency as it does with the provider, the Department could do nothing more than contact the collection agency and request that it cease billing the recipient. While the Department could sanction the Medicaid provider who has hired a collection agency to collect a medical bill, it has never imposed such sanctions. In cases in which the Medicaid provider has already sold the unpaid medical bill, Mr. Hanley stated that they would contact the collection agency, understanding they have no contract with the collection agency. Although the provider would be in violation of his contract, sanctions would be difficult to impose. Mr. Hanley stated that to his knowledge, this has never come up and he is not sure how he would deal with the situation. Also, in those situations where recipients are being billed for non-covered services, calling the toll-free telephone number does not provide the recipient with a forum in which to challenge the Department's determination. The Department merely investigates the recipient's inquiry rather than provide the recipient with an opportunity to present evidence or cross-examine witnesses regarding the adverse determination.

■ 9. In *Goldberg,* the Supreme Court held that welfare entitlements should be viewed more like " 'property' than a 'gratuity' ". *Goldberg,* 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8; *Atkins v. Parker,* 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985). As such, recipients of Medicaid benefits are entitled to be given timely and adequate notice detailing the reasons for the unfavorable action and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally. *Goldberg,* 397 U.S. at 267–268, 90 S.Ct. at 1020–1021.

10. Other United States Supreme Court rulings have further defined the meaning of procedural due process under the United States Constitution.

■ 11. The essence of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). To that end, states must provide welfare recipients timely and adequate notice of benefit determinations and an opportunity to contest these determinations. *Goldberg,* 397 U.S. at 267, 90 S.Ct. at 1020. The notice provided must include notice of the availability of the right to a hearing. *See Memphis Light, Gas and Water Division v. Craft,* 436 U.S. 1, 14, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978). Thus, due process requires that the state send all Medicaid recipients notice and the opportunity to be heard on any action it intends to take. The regulations set out what these notices must contain. See 42 C.F.R. § 431.210. The regulations are not ambiguous, vague or unclear. The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard. *Goldberg,* 397 U.S. at 268–269, 90 S.Ct. at 1020–1021.

12. In *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court articulated a three-pronged standard for making a determination of the precise scope of procedural safeguards required by due process. This "balancing test" weighs three distinct factors: (a) the private interest that will be affected by the official action; (b) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (c) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Matthews* at 335, 96 S.Ct. at 903. *See also Payne v. Ballard*, 595 F.Supp. 878 (E.D. Ark.1984); *aff'd.* 761 F.2d 491 (8th Cir. 1985). When applying the first factor of *Matthews*, it is clear that these plaintiffs have a property interest protected by the United States Constitution.

13. In balancing the second requirement of *Matthews*, i.e., an analysis of the risk of erroneous deprivation of that interest, along with the probable value of additional safeguards, the Court is persuaded by the plaintiff's arguments that if the defendant makes an erroneous decision that a claim ought to be denied, it has several adverse effects. The recipient rightfully assumes the claim was paid, budgets accordingly and forgets about it. Then, several months later, they get either a demand letter or a summons. A summons can have a devastating effect on a Medicaid recipient. The time, costs and hardships involved in defending the action is more than a lot of indigent, elderly recipients can bear. It affects the inherent trust required in the doctor-patient relationship. The recipient resents the provider suing them over a bill that probably should have been paid by the state. This is even more likely in cases of technical denials, in which the doctor's office failed to properly complete the claim form. Erroneous deprivation also has a chilling effect on recipients. They may not seek the medical care they need for fear of the financial burden it could create.

14. One of the primary reasons for requiring notice is to give the recipient or the provider the opportunity to "cure" any defects that may have resulted in the denial of the claim. Compliance with the law would also substantially reduce the medical collection lawsuits filed in the state courts.

15. The defendants readily admit that reasonable minds could disagree as to whether or not a service is covered and further admit that some recipients could win some of the appeals. Given the foregoing, it is clear that providing notice and an opportunity to be heard when requests for payments are denied for any reason can be of substantial benefit.

16. The last criteria of *Matthews* is to determine the burden on the state that requiring compliance would entail. Mr. Hanley stated that in the course of a month, the department denies somewhere in the neighborhood of 100,000 claims for a number of reasons, technical reasons, non-covered services, and otherwise. He states further:

> To generate a letter when a service is denied because it is a non-covered service or in excess of their benefit limit, which we consider to be a non-covered service, if it is a service that is billed when they've already received their benefit limit, including prescription drugs, we would be looking at approximately 6,000 letters a week. We've addressed some of these numbers in our request for a waiver to HCFA. Just the initial front end programming and cost would be approximately $9,200. ...

> ... that's the computer cost just to program it, and obviously that's the small part. To generate the letters, obviously you have the postage for 6,000 letters a week, you have the cost of printing the letters, which is approximately a nickel a letter, then perhaps the bigger cost is trying to staff for the fair hearings that would be requested. ... An estimate is five staff would be needed to add in the fair hearing section, including salary and fringe benefits would cost approximately $20,000 a piece for a total of $100,000 a

year. For these people to travel for the fair hearings to the various county social service offices is estimated at $225 a week. Those are the initial cost estimates that we have.

17. The fiscal and administrative burden placed upon the Department by implementing the statutorily and constitutionally required due process safeguards is insignificant when compared to the above-stated benefits to Medicaid recipients such as plaintiffs. The validity of the stated costs for hearing officers and their related expenses is questionable given the fact that in denial of prior authorization cases in which recipients are given the right to a fair hearing, "the only added expense is just sending a second copy of the letter to the recipient." Furthermore, Mr. Hanley stated that whether the state could afford to send notices as described above is not, in his opinion, the main basis for the state's appeal or request of waiver.

It is not a question of not being able to afford it. I think, as I've said before, it is a case of the mechanisms that we already have in place in combination with the revised policy, in our opinion, are adequate. I don't think that it's a question of not being able to afford it. It's a question of, is it cost effective to go to this extent or not for the benefit of the people. Is it money well spent? It's not a question of not being able to afford it. It is a question of spending the money wisely; that is the question.

... In view of the mechanisms that are already in place, I do not believe that that would be a prudent expenditure of this amount of money, no.

Apparently, there has been no need to add new staff to the Department Fair Hearing Section as a result of the new policy. Based upon the foregoing, the Department's failure to implement due process safeguards is not a question of economics, or an increased administrative burden. Therefore, there is no rational basis for the defendants' failure to implement due process procedures for Medicaid denial claims.

18. Effective September 1, 1986, the Department amended the Provider's Manual so that a Medicaid provider is prevented from billing the recipient when a request for payment is denied for technical reasons, lack of medical necessity, failure to obtain prior authorization and charges for medical services above the Medicaid allowable limit. Certainly justice requires this change in the policy manual and that the Medicaid provider be prevented from billing the recipients for payment of services when the denial of payment was based upon the provider's own fault. By adopting this change in policy, it is the Department's position that the procedural due process protection delineated in 42 C.F.R. § 431.200 *et seq.* are not applicable. The Court disagrees.

19. The Court agrees with the plaintiffs that it is the responsibility of the defendant to insure that Medicaid providers comply with the state policies and federal regulations governing the Medicaid program. Only the defendant has the right to sanction Medicaid providers who wrongfully seek payment of medical bills from Medicaid recipients. In general, the Medicaid recipient population consists of the poor and/or disabled, individuals who are ill-equipped either financially or physically to defend themselves in collection lawsuits that may be wrongfully filed by collection agencies or Medicaid providers. Coupled with the fact that Medicaid recipients will not be advised by the Department, as a result of the enactment of its amended policy, that they are not liable for the unpaid medical bills renders the Department's position that due process safeguards should not be afforded Medicaid recipients even more untenable.

20. In order to adequately protect the interests of Medicaid recipients for whose benefits the Medicaid program was established, the Court is of the opinion that it is absolutely necessary that Medicaid recipients receive notice that a request for payment has been denied for a specific reason and that, as a result, they are either liable or not liable for the unpaid medical bill. If a request for payment has been denied for one of the four reasons covered

by the Department's proposed change in policy, it would be very simple and inexpensive for the Department to send a notice to the recipient advising the recipient of the denial, the reasons therefore and their non-liability for the unpaid medical bill. Then, if a Medicaid recipient was sued for that medical bill, the Medicaid recipient could appear in court and present the notice as some evidence of their non-liability. Such a notice could place the Medicaid recipient in a better position to successfully defend an unwarranted collection lawsuit.

21. Based upon the foregoing, the Court finds that the plaintiffs have clearly established that their property rights to Medicaid benefits have been deprived by the Department's failure to establish the constitutionally and statutorily mandated due process safeguards of notifying Medicaid recipients of its disposition of requests for payment and an appeal process by which to challenge the disposition. Plaintiffs should be given the opportunity to challenge unfavorable dispositions of requests for payment administratively as required by law. Therefore, the Court finds that the defendant Department's current policies, including the policy that went into effect September 1, 1986 are in violation of the United States Constitution and federal law; and directs the defendant to establish procedures providing plaintiffs with notification of unfavorable dispositions and an appeal process by which to challenge those dispositions. The Court also directs that the plaintiffs' requests for payments be re-opened to allow for re-filing of corrected requests for payments or the filing of an administrative appeal together with their costs. The parties are directed to submit briefs on the request for reasonable attorney's fees for the prosecution of this case by no later than October 31, 1986.