HOUSING AUTHORITY OF THE CITY OF NEWARK, ETC., PLAINTIFF-APPELLANT, v. COMMISSIONER, DEPARTMENT OF INSTITUTIONS & AGENCIES, *ET AL.*, DEFENDANTS-RESPONDENTS.

HOUSING AUTHORITY OF THE CITY OF NEWARK, ETC., APPELLANT, v. ANN KLEIN, COMMISSIONER DEPARTMENT OF INSTITUTIONS & AGENCIES, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted June 10, 1975—Decided June 30, 1975.

137

Before Judges CARTON, CRANE and KOLE.

*Messrs. Friedman & D'Alessandro,* attorneys for appellant Housing Authority of the City of Newark (*Messrs. Edward G. D'Alessandro and Michael F. Lombardi* on the brief).

*Mr. William F. Hyland,* Attorney General of New Jersey, attorney for respondent Commissioner of the Department of Institutions and Agencies (*Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Ms. Joan W. Murphy,* Deputy Attorney General, on the brief).

*Mr. William Tamburri,* attorney for respondent Essex County Welfare Board, filed a statement relying on brief of Commissioner of the Department of Institutions and Agencies.

*Mr. Milton A. Buck,* attorney for respondent Division of Public Welfare of the City of Newark, filed a statement relying on brief of Essex-Newark Legal Services Project.

*Messrs. J. Michael Callan and Harris David* (Essex County Legal Services Project), attorneys for intervenors-respondents Ruby Leverett, Verna Barnhill, Helen Mitchell, Nora Elliot and Julia Smith, individually and on behalf of all others similarly situated (*Mr. Michael C. Parks* on the brief).

The opinion of the court was delivered by

CARTON, P. J. A. D. These consolidated appeals from a judgment of the Superior Court, Chancery Division, and from an administrative determination by the Commissioner of the Department of Institutions and Agencies involve proceedings arising out of a rent strike in housing projects under the control of the Housing Authority of the City of Newark. Plaintiff Authority is a public corporation created according to *N. J. S. A.* 55:14A–1 *et seq.* At the time this action was brought the Authority was operating 23 basic housing projects in Newark. (Defendants are the municipal, county and state agencies responsible for administration of various programs of public assistance.)

In April 1970 many of the tenants in the various projects began a rent strike. The rent strike was a protest against the allegedly uninhabitable conditions of the housing projects.

Of the 12,720 families in Authority-operated housing projects, 5,297 receive some form of public assistance. 2,729 of these families were, as of August 2, 1973, delinquent in the payment of monthly rentals. Total arrearages for all tenants amounted to about $6,000,000. Of this sum $2,500,000 represented delinquencies accumulated by the 2,729 tenant families on welfare.

Plaintiff's complaint describes the critical situation which had come about. Because of the curtailment of revenues the

difficulties of maintaining operation of the various projects have been aggravated. Suppliers of vital services were owed in excess of $3,000,000 and the Authority was unable to make necessary repairs. This, in turn, provided the tenants with an excuse to continue to withhold rentals. The Federal Government failed to provide assistance because the amount of funds available from the Department and Urban Development is fixed as a maximum deficit — assuming payment of rentals.

Plaintiff sought direct payments from the Essex County Welfare Board. When that Board informed it that it was not possible to make such payments, plaintiff brought the Chancery action in September 1973 against the Department of Institutions and Agencies, Essex County Welfare Board and the Division of Public Welfare of the City of Newark. In that action it sought determinations that nonpayment of rent by a tenant receiving public assistance, any part of which was represented by shelter needs, constitutes a misuse of public assistance funds and that such nonpayment of rentals to the Authority was a substantial factor in contributing to the critical situation facing it and was detrimental to the best interests of all public assistance dependents in the various projects. On this basis plaintiff requested an order compelling defendant welfare agencies to turn over as a "vendor" or "protective payment," either directly to the Authority or other person as the court shall appoint as a "vendor" or "protective payment," the portion representing shelter needs of every public assistance grant due and to become due to any delinquent tenant.

Various welfare recipients were permitted to intervene, individually and on behalf of others similarly situated. After oral argument Judge Kimmelman, on March 11, 1974, dismissed the complaint on the ground that plaintiff had failed to exhaust any administrative remedy which it may have through the Department of Institutions and Agencies for appropriate relief under these compelling circumstances. In

doing so Judge Kimmelman observed, among other things, that the Commissioner should give consideration to formulating a method whereby the shelter grant will be made to serve its intended purpose. He suggested that an independent fiscal agent might be utilized to receive such funds on behalf of the tenants and disburse them for the mutual benefit of the tenants and the Authority, or, alternatively, that the services of a judicially-appointed rent receiver could be engaged to insure that the withheld rentals be used to provide necessary services and make needed repairs under the court's supervision.

In April 1974 plaintiff proposed to Commissioner Klein of the Department of Institutions and Agencies that she meet with representatives of the United States Departments of Health, Education and Welfare (HEW) and Housing and Urban Development (HUD) to discuss the relief sought in the Chancery action and the suggestions made by Judge Kimmelman. Early in May Commissioner Klein advised plaintiff that her department had given serious consideration to plaintiff's proposal, "but would decline to adopt it both for legal and policy making considerations in the absence of a court order to the contrary." Hence the present appeal.

As to the Chancery Division action, we conclude that Judge Kimmelman correctly dismissed plaintiff's action for failure to exhaust administrative remedies. It is clear that at the time plaintiff commenced its action it had broached its proposal only to the Essex County Welfare Board, and then only by an exchange of correspondence. It should have requested a final determination by the Commissioner of Institutions and Agencies before seeking judicial relief. In any event, the issue is moot since plaintiff did later pursue its remedy to the Commissioner of Institutions and Agencies after the court's ruling, and she declined to grant the relief requested. It is her determination with which we are now concerned.

■ The central issue is whether welfare payments may be paid to the Authority to compensate it for delinquent rent payments. Determination of that issue must be decided on the basis of the applicable state and federal laws. Conflicting questions of public policy as to whether welfare tenants should be allowed to have a "free ride" at public expense and whether the Authority may use the welfare system to combat a rent strike are tangential to this issue and should play no part in determination of this legal issue.

The record indicates that tenants receive assistance in the form of Old Age Assistance (OAA), Aid to Families with Dependent Children (AFDC), Aid to the Blind (AB), and Aid to the Permanently and Totally Disabled (APTD). The vast majority of delinquent welfare tenants receive public assistance in the form of AFDC.

State participation in a federally-supported categorical assistance program is voluntary. However, a state choosing to participate must comply with the terms of the federal legislation and regulations promulgated by HEW and must secure HEW approval of its plan for implementation of the program. *Hausman v. Dept. of Institutions and Agencies,* 64 *N. J.* 202, 206–207 (1974), *cert.* den. 417 *U. S.* 955, 94 *S. Ct.* 3083, 41 *L. Ed.* 2d 674 (1974).

The settled interpretation of welfare was stated in *Goldberg v. Kelly,* 397 *U. S.* 254, 90 *S. Ct.* 1011, 25 *L. Ed.* 2d 287 (1970):

* * * We have come to recognize that forces not within the control of the poor contribute to their poverty. This perception, against the background of our traditions, has significantly influenced the development of the contemporary public assistance system. Welfare, by meeting the basic demands of subsistence, can help bring within the reach of the poor the same opportunities that are available to others to participate meaningfully in the life of the community. At the same time, welfare guards against the societal malaise that may flow from a widespread sense of unjustified frustration and insecurity. Public asistance, then, is not mere charity, but a means to "promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity. [397 U. S. at 265, 90 *S. Ct.* at 1019, 25 L. Ed. 2d at 297]

Thus, the AFDC program was established for the purpose of helping the parents or relatives of needy children "attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." 42 *U. S. C. A.* § 601 (Title IV-A of the Social Security Act). This approach is adopted in the companion state statute, *N. J. S. A.* 44:10–1 (a) (3). Regulations promulgated pursuant to *N. J. S. A.* 44:10–1 *et seq.* emphasize this "independence" factor:

In public assistance the principle of assistance by money payments is based on the concept of affording every needy person the fullest reasonable opportunity *to plan for himself, to decide what use of his assistance payment will best serve his interests, and to make his purchases through the normal channels of exchange, enjoying the same rights and discharging the same responsibilities as to other members of the community.* [*N. J. A. C.* 10:81–18.1; emphasis supplied]

To achieve these objectives AFDC benefits are made in the form of "money payments." 42 *U. S. C. A.* § 606(b). As explained in 45 *CFR* § 234.11(a),

Federal financial participation is available in money payments made under a State plan under Title I, IV–A, XIV, or XVI of the Social Security Act to eligible families and individuals. Money payments are *payments* in cash, checks or warrants immediately redeemable at par, *made to the grantee* or his legal representative *with no restrictions imposed by the agency on the use of the funds.* [Emphasis supplied]

Restrictions may be placed on the use of payments when the state agency has reason to believe that the money is not being used in the best interests of the child. In such a case protective payments may be authorized. 42 *U. S. C. A.* § 605. Thus, 45 *CFR* § 234.60 provides for protective and vendor payments for dependent children. Under (a)(1), if a state plan for AFDC provides for protective and vendor payments for other than (WIN) cases, it must meet the requirements of paragraphs (2) through (11).

Two of these requirements are particularly relevant here. Subsection (3) requires the establishment of criteria to determine under what circumstances payments will be made in whole or in part directly to another individual who is concerned with the welfare of the child or a person furnishing food, living accommodations or other goods, services or items to or for the child or relative. Subsection (7) requires the establishment of standards for selection of protective payee "with the selection of a protective payee being made by the recipient, or with his participation and consent, to the extent possible." It specifies that

*The selection will not include*: the executive head of the agency administering public assistance; the person determining financial eligibility for the family; special investigative or resource staff, or staff handling fiscal processes related to the recipient; or *landlords, grocers, or other vendors of goods or services dealing directly with the recipient.* [Emphasis supplied]

Similar protective payments are provided for the aged, blind, or disabled in 45 *CFR* § 234.70.

The federal scheme thus envisions situations where the relative of the dependent child is unable to manage funds. In such cases, after the relative has been found unable to manage the funds under pre-established standards, protective payments may be arranged. However, the relative must be given every opportunity to decide to whom the protective payments are made. Moreover, landlords are expressly excluded as potential protective payees. The regulations could not conceivably have been meant to cover a situation such as that at bar whereby tenants willfully withheld rentals pursuant to *Berzito v. Gambino,* 63 *N. J.* 460 (1973), in order to secure the standard of housing as set forth in 42 *U. S. C. A.* § 1401 *et seq.*

The New Jersey regulations are consonant with the federal regulations and with *N. J. S. A.* 44:10–3(h), which assures that the payments will be terminated if the dependent child is not properly maintained. The state definition of "money

payments" includes (1) "Unrestricted payments," checks drawn to the order of the recipient or his legally appointed guardian and immediately available for his unconditional use; (2) "Restricted payments," checks drawn to the recipient or guardian which are subject to some condition; (3) "Vendor payments," checks drawn to the order of a person who has provided goods or services to or for the client. *N. J. A. C.* 10 :81–18.2. *N. J. A. C.* 10 :81–18.3 states that the federal definition of "money payments" is limited to the State's definition of unrestricted money payments. *N. J. A. C.* 10 :81–18.4 emphasizes the fact that federal participation is limited to unrestricted payments or payments "to the vendor of a medical service for the recipient, provided the payment is for a class of medical service specially authorized in the State Plan." To qualify for federal matching funds as unrestricted, a money payment must be drawn to the order of the recipient or guardian and payment must be made without direction that the recipient must use his money in a specified way. See *N. J. A. C.* 10 :81–18.4(c).

*N. J. A. C.* 10 :81–18.21 *et seq.* adheres to 45 *CFR* § 234.60 in setting standards for payment by incompetent recipients and defines the term "incompetent." *N. J. A. C.* 10 :81–18.21(a) states that:

> The principle of money payments presumes that the person is physically and mentally able to manage his personal affairs. It is recognized, however, that some persons otherwise eligible, cannot be effectively provided for through the issuance of cash payments, either because they are legally barred from endorsing checks or because otherwise inadequate to manage their own affairs.

See also, *N. J. S. A.* 44 :11–1 which defines "functionally incompetent" as "subject to a mental, physical or emotional condition which renders the individual incapable of receiving and utilizing payments of public assistance in a manner conducive to the health and well-being of himself and his dependents."

*N. J. A. C.* 10:91–18.23 authorizes assistance to be provided for incompetent persons by payment to a protective payee. *N. J. A. C.* 10:81–18.25(b) forbids the appointment as protective payees of vendors of services for recipients, stating that, "No person shall be appointed a protective payee when such appointment would raise questions of conflict of interest." *N. J. A. C.* 10:81–18.28 provides that the protective payee be selected, so far as possible, with the participation of the recipient. "The major personal criterion for selection of a protective payee is an interest in being of service to the recipient so as to work with him in a way that preserves, strengthens and helps develop his ability to make decisions and to manage his own assistance program."

Clearly, here, as under the provisions of 45 *CFR* § 234.60, the Housing Authority could not possibly qualify as a protective payee. Rather, the protective payee is expected to come from one of these sources: the immediate family and other relatives and friends; a person previously appointed to act on behalf of the client by another state or federal benefit-paying agency, and staff members of voluntary agencies. *N. J. A. C.* 10:81–18.28(c).

Plaintiff further argues that the flat grant system utilized by the New Jersey welfare system specifically takes into account three separate need categories: (1) personal and household needs, (2) shelter and (3) special circumstances. This fact lends no support to plaintiff. That a definite portion is allocated for shelter does not mean that that portion can be summarily extracted and paid over to the Housing Authority. The shelter allocation is an average based on statewide calculations. Indeed, the fact that the shelter grant is a constituent part of the flat grant indicates a desire "to give welfare recipients more control over their lives by eliminating second-guessing on expenditures by paternalistic welfare workers." See *N. J. Welfare Rights Org. v. Cahill,* 349 *F. Supp.* 501, 504 (D. N. J. 1972), aff'd 483 *F.* 2d 723 (3 Cir. 1973).

Alternatively, plaintiff bases its argument on two recently promulgated federal regulations. 45 *CFR* § 234.75 provides:

> Rent payments to public housing agencies.
> At the option of a State, if its plan approved under title I, X, XIV, or XVI of the Social Security Act so provides, Federal financial participation under such title is available in rent payments made directly to a public housing agency on behalf of a recipient or a group or groups of recipients of OAA, AB, APTD or AABD. Such Federal financial participation is available in rent payments only to the extent that they do not exceed the amount included for rent under the State's standard of assistance to the amount of rent due under applicable law, whichever is less.

45 *CFR* § 234.120 states that:

> Federal financial participation.
> Federal financial participation is available in assistance payments made under a State plan under title I, IV–A, X, XIV or XVI of the Social Security Act to any family or individual for periods beginning with the month in which they meet all eligibility conditions under the plan and in which an application has been received by the agency. Such assistance payments include:
> (a) Money payments (titles I, IV–A, X, XIV and XVI, see § 234.11 of this chapter);
> (b) Protective and vendor payments for dependent children (title IV–A, see §234.60 of this chapter);
> (c) Protective payments for the aged, blind, or disabled (titles I, X, XIV, and XVI, see § 234.70 of this chapter);
> (d) AFDC foster care payments (title IV–A, see § 233.110 of this chapter);
> (e) Vendor payments for institutional services in intermediate care facilities (titles I, X, XIV and XVI) but only in a State that did not, as of January 1, 1972, have an approved plan under title XIX of the act, and only until such State has a plan in effect. (See § 234.130 of this chapter);
> (f) Emergency assistance to needy families with children (title IV–A, see § 233.120 of this chapter);
> (g) Vendor payments for home repairs (titles I, IV–A, X, XIV and XVI, see § 233.20(c) of this chapter); and
> (h) *Rent payments to public housing agencies (titles I, X, XIV and XVI, see § 234.75 of this chapter).* [Emphasis supplied]

Titles I, X, XIV and XVI refer to the assistance plans of OAA, AB, APTD and AABD. (These plans, dealing with aid to the aged, blind or disabled and for medical assistance

to the aged, were replaced by a completely federally-funded program effective January 1, 1974. See 42 *U. S. C. A.* § 1381 *et seq.; N. J. S. A.* 44:7–85. Thus, the relevancy of 45 *CFR* § 234.120(h), even to those delinquent tenants who are recipients of aid from programs other than AFDC, is moot.)

Title IV–A pertains to AFDC. The gist of plaintiff's argument here is that the regulation must be construed so as to apply to AFDC because Title IV–A is mentioned in the introductory paragraph. Such a construction is absurd. The introduction mentions all the aid programs which could conceivably be covered by the regulation. Each specific subparagraph is then directed at specific programs. Thus, subparagraph (b) deals with protective payments to dependent children and refers to Title IV–A (AFDC) and 45 *CFR* § 234.60. Subparagraph (c) deals with protective payments for the aged, blind or disabled and refers to Titles I, X, XIV and XVI and 45 *CFR* § 234.70. Subparagraph (h) deals with rent payments to public housing agencies and refers only to Titles I, X, XIV and XVI and to 45 *CFR* § 234.75, which, in turn, deals only with those aid programs and not with AFDC. Thus, plaintiff's argument that 45 *CFR* § 234.120(h) allows for payments of AFDC funds to housing authorities is devoid of merit.

We deem none of the cases relied upon by plaintiff to be apposite to the circumstances of this case.

We see no reason to comment on plaintiff's remaining arguments, except the contention that the regulations are arbitrary because they do not provide for nonmedical vendor payments while providing for medical vendor payments. This argument was not raised in the pleadings below and need not be decided. In any event, we find it to be without merit. We observe that direct payment for medical care is specifically permitted under 42 *U. S. C. A.* § 606(b). We also observe that the Equal Protection Clause does not necessarily require that a regulation apply equally to different

persons. Consequently, the tenant's right to withhold rent under certain circumstances may well provide a rational basis for different treatment of medical payments and rental payments.

In sum, we conclude that there exists no federal or state regulation that would allow the court to order the Department of Institutions and Agencies to pay delinquent rentals directly to the Housing Authority. The determination of the Commissioner of Institutions and Agencies is therefore affirmed.