Randall L. VANCE, Plaintiff

v.

HOUSING OPPORTUNITIES COM-
MISSION OF MONTGOMERY
COUNTY, MARYLAND, et al., Defen-
dants

No. CIV. PJM 03–427.

United States District Court,
D. Maryland.

July 17, 2004.

Chadwick Christian Duran, Esquire, Jennifer Leigh Berger, Esquire, Riverdale, MD, for Plaintiffs.

Charles Lowell Frederick, Esquire, Frederick, MD, for Defendants.

## *OPINION*

MESSITTE, District Judge.

### I.

Randall L. Vance, by counsel, has sued the Housing Opportunities Commission of Montgomery County, Maryland (HOC) and several of its employees—Scott Minton in his capacity as Executive Director, Mark Looney in his capacity as Program Coordinator of the Supportive Housing Program (the Program), Cathy L. Kramer in her capacity as Program Specialist of the Program, and Charlotte Taylor as Program Coordinator of the Program. Vance presents claims under the McKinney–Vento Homeless Assistance Act, 42 U.S.C. § 11381 *et. seq.* and 24 C.F.R. § 583.100 *et. seq.;* the Due Process Clause of the 14th Amendment to the U.S. Constitution and 42 U.S.C. § 1983; the Fair Housing Act, 42 U.S.C. § 3601 *et. seq.;* and the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 24 C.F.R. § 8 *et. seq.* He asks for declaratory and injunctive relief with respect to benefits provided through the McKinney VI Supportive Housing Program administered by HOC.[1] His claims stem from being terminated from the Program by HOC, effective November 30, 2001, and thereafter being denied reinstatement into the Program in October 2002.

The matter came before the Court on Vance's Motion for Preliminary Injunction. At the close of the hearing on the Motion, the Court delivered an oral opinion from the bench, GRANTING the Motion IN PART and DENYING it IN PART. A written Order to that effect was filed the same day.

Since then, the parties have asked the Court to memorialize its Opinion in writing, which it does at this time.

### II.

To facilitate an understanding of this case, a brief discussion of the legal context will be helpful:

1. HOC administers multiple McKinney grants, each designated by a Roman numeral. The number VI connotes one particular grant, hence the reference to the "McKinney VI Supportive Housing Program."

In order "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, native Americans and veterans," Congress passed the Stuart B. McKinney Homeless Assistance Act (subsequently renamed the McKinney–Vento Homeless Assistance Act), 42 U.S.C. § 11301 *et. seq.* A major creation of the law was the Supportive Housing Program, the purpose of which was "to promote the development of supportive housing and supporting services, including innovative approaches to assist homeless persons in the transition from homelessness, and to promote the provision of supportive housing to homeless persons to enable them to live as independently as possible." 42 U.S.C. § 11381. The United States Department of Housing and Urban Development (HUD) thereafter promulgated regulations implementing the Program. 24 C.F.R. § 583.100 *et. seq.*

Under the Program, governmental entities and non-profit organizations are authorized to apply for funding. HOC did so and is charged with coordinating the Supportive Housing Program in and for Montgomery County, Maryland.

The federal statutes and regulations and local policy establish who is eligible to receive benefits under the Program, the type of benefits available, the obligations of Program participants, and the manner in which a participant may be terminated. Certain of these provisions will be discussed in greater detail in the course of this Opinion.

## III.

Randall Vance, 35 years of age, has been diagnosed with paranoid schizophrenia,[2] as well as alcohol abuse. He is the single father of a nine-year old son, Donte Pope. Vance was a participant in the McKinney VI Supportive Housing Program administered by HOC from March 3, 2000 through November 30, 2001. He was accepted into the Program because he lacked permanent housing and because of his psychiatric condition.[3]

On January 13, 2000, prior to entering the Program, Vance signed a Supportive Housing Occupancy Agreement with HOC whereby HOC agreed to provide him with rental assistance to lease and occupy an appropriate residence. The term of the Agreement was to be three years. In accordance with its terms, Vance agreed to pay HOC a fee equal to 30 percent of his family's monthly adjusted gross income and HOC would pay the balance of the rent to Vance's landlord. The HOC fee was made due and payable on the first day of each month. Failure to make payment within 10 days of the due date could "be considered a basis for termination of [the] Agreement, and termination of [the] rental assistance payments to the landlord." Vance's initial monthly fee was computed as $614.00. Cathy L. Kramer, a Program Specialist, who was to become Vance's caseworker, signed for HOC.

In addition to maintaining residential and financial stability, including timely payment of his rent,[4] Vance's individual

---

**2.** "Schizophrenia-paranoid type" is described in the Diagnostic and Statistical Manual of Mental Disorders, *DSM–IV* at § 295.30, in part, as follows:

The essential feature of the Paranoid Type of Schizophrenia is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive functioning and affect.

**3.** Vance had been in one of the HOC's McKinney programs previously, but not one dedicated to individuals with mental disabilities.

**4.** The Supportive Housing Program, in addition to providing housing assistance, provides

treatment goals under the Program required that he maintain (1) psychiatric stability (*i.e.* that he see a psychiatrist on a monthly basis to undergo medication management); (2) medical stability (*i.e.* that he see a dentist and have his son see a dentist); (3) vocational/educational activities; (4) social/recreational activities; and (5) child well-being (*i.e.* that he pay for child care).

By the end of February, 2000, Vance and his son were occupying an apartment at 2374 Glenmont Circle in Silver Spring, Maryland. Since his adjusted monthly income as of that time was $1,833.45, Vance's 30% fee obligation to HOC was soon after retroactively reduced to $550.00 per month. Vance, however, immediately failed to make his payments.[5] HOC Program Specialist Kramer as well as other case workers promptly took Vance to task, reminding him repeatedly that non-payment of rent might lead to his termination from the Program. As it happened, because of an injury allegedly sustained at work, Vance received no paychecks for April and May. Accordingly, his fee to HOC for those two months was reduced to $25.00, the minimum amount payable by a participant under the Program.

Even so, Vance's arrearage accumulated quickly—by August it exceeded $2,300— and, despite executing Repayment Agreements and receiving some salary for June and July, he continued to miss his payments. By October, he was no longer employed, so that as of November HOC reduced his monthly obligation more or less indefinitely to the $25 minimum. Still

Vance paid no fee. In November, Kramer sent Vance another letter warning him again of the possible consequence of non-payment. Again, he was heedless.

Finally, in early January, 2001, Vance sent HOC a money order for $105.00. But he immediately slumped again, missing his February and March payments.[6] On March 26, Kramer wrote to him once again, reminding that he had not paid rent in two months and stating he was "in jeopardy of being terminated from the program." When April also passed without a payment, Kramer, by letter dated April 17, let Vance know that he "would soon receive a letter of termination from the program."

That letter arrived on May 7, 2001. In it, Kramer and Supervising Housing Coordinator Mark Looney advised Vance that he had been "terminated" from the Program for non-payment of rent, noting that "(b)udgeting and paying ... rent is an important component of becoming self-sufficient." The letter gave Vance an effective termination date of June 30 so that he could search for other resources. It also advised Vance that he could appeal the decision and referred to an enclosure entitled "Appeal Procedures of Supportive Housing Program Terminations," which had a tear-off for requesting the appeal. The Procedures indicated that, if Vance desired a hearing, he should send the tear-off within 5 working days to the Program Specialist who signed the termination letter, *i.e.* to Kramer. The Procedures continued:

---

for such supportive services as health services and employment counseling. *See* 42 U.S.C. § 11385.

5. He also immediately fell out of compliance with most if not all of his other treatment goals. However, since the critical issue in this case ultimately became his non-payment

of rent, the Court sees no need to elaborate on the other aspects of the case at this juncture.

6. Although HOC's account ledger does not reflect it, Vance may have sent in a $40.00 money order on or around March 21.

If you appeal the termination, a hearing will be held by a panel of two people who have not been involved in the decision to terminate you from the program. You may bring an attorney or representative to the hearing. You may also bring relevant witnesses or copies of documents. At the hearing, the evidence to support the termination case will be presented. You will have the opportunity to respond to such evidence. The Appeal Panel will issue a written decision within five business days after the hearing.

The tear-off Request for Appeal read:

I have received a letter of termination from HOC's Supportive Housing Program. I wish to appeal this termination. I understand that a hearing will be held before an impartial panel where I can present evidence and witnesses. I acknowledge that I have the right to bring an attorney or representative to speak in my behalf at the hearing.

Vance signed the Request for Appeal, tore it off and on May 8 submitted it to Kramer. At the same time he sent HOC another $105.00.

On May 21, Vance's case management team prepared a Termination Memo reviewing his history of continuous noncompliance with all aspects of his treatment plan. The team recommended that he be terminated from the Supportive Housing Program, citing *inter alia* his "noncompliance towards monthly rent payments, which is an obligation to remain in the program."

On June 1, without counsel, Vance appeared at the HOC office before an Appeal Panel consisting of Lillian Durham of HOC and Karen Buckingham of Montgomery County's Health and Human Services Department, who was not affiliated with HOC. Also present were Program Coordinator Looney, Program Specialist Kramer, and a few other individuals. According to Durham's testimony at the Preliminary Injunction hearing, Vance was given every opportunity to speak at the termination hearing and was calm, coherent and articulate. Vance, she testified, said he understood the proceedings. Looney and Kramer apparently made formal statements in Vance's presence at the termination hearing, and he was given an opportunity to cross-examine them. Vance claims he was cut off when he made objections, but it is not clear to what extent his objections were properly taken. What is clear, however, is that after Vance departed the hearing, Looney and Kramer remained behind and consulted with the members of the Panel, in Kramer's words "in clarification" of some matters. Thereafter it was Looney and Kramer (not Durham or Buckingham) who drafted, signed and sent Vance the decision of the Panel, *i.e.* the letter dated June 13, stating that the Panel would rescind Vance's termination from the Program if he were to comply with the terms of a three month probation.[7] Among the conditions of Vance's probation, in addition to paying rent on time, were that he should apply for all benefits, including Supplemental Security Income (SSI), food stamps, and the like; produce documents exploring the reduction of child support payments for another child of Vance; participate in mental health therapy and substance abuse/addiction treatment on a regular basis; participate actively in a job search; apply for emergency assistance for back rent and pay monthly on a new repayment

---

7. Durham testified at the Preliminary Injunction hearing, however, that the letter accurately reflected the Appeal Panel's decision.

agreement; take his son to daycare as scheduled; and meet regularly and cooperate with his case management team. "Failure to comply with the above stipulations," the letter concluded, "will result in immediate termination."

On June 11 Vance made a $25.00 fee payment to HOC and on July 10 another $25.00 payment. August, however, proved his undoing; he missed the payment. Accordingly, by letter dated August 22, Looney and Kramer notified him that "unfortunately you have not paid your rent by August 10, 2001, which means you have not complied with the ... stipulations." Therefore, he was advised, his new termination date would be 30 days from the date of the letter.[8]

Vance made a $52.00 payment to HOC on September 5 but to no avail. As far as HOC was concerned, he was out of the Program. On September 7, he was referred to Karen McNally of Linkages to Learning, a school-based health and human services partnership of public and private agencies in Montgomery County, who attempted to assist him in preserving his supportive housing or alternatively in locating other housing. On Vance's behalf, McNally contacted Looney and inquired whether Vance could appeal the August 22 termination decision, but Looney indicated that Vance's appeal rights were foreclosed. Looney may also have told McNally at that time that Vance could not apply for reinstatement into the Program for at least a year.

Vance's subsidy under the Program ended on November 30, 2001 and eventually, in February of 2002, he and his son were evicted from their apartment for failure to pay rent. From February 2002 to December 2002 they resided in homeless shelters and motels funded by the Montgomery County Department of Health and Human Services' Emergency Services Program. Assisting them in that regard was Tanya Cottle, a social worker with the Emergency Services Program.

On or about April 25, 2002, Cottle met with Looney and McNally's supervisor, Amy Christianson, to discuss the possibility of Vance being reinstated in the Supportive Housing Program. At that meeting, Looney definitely stated that Vance could not be considered for reinstatement until September 2002, one year after the effective date of the termination decision.

After his termination from the Supportive Housing Program, Vance maintained regular communication with McNally, his case manager at Linkages to Learning, who connected him with a variety of community services. These included a program for single fathers and an HVAC training course. In addition to maintaining contact with the Montgomery County Department of Health and Human Services Emergency Services Program, Vance was able to obtain regular psychiatric counseling.

In September 2002, Vance applied for reinstatement in the Supportive Housing Program and an interview was set for October 2. Despite his request to have his mother, case worker McNally and/or an attorney present at the interview, he was advised by HOC that such representatives could not attend. The apparent reason was that HOC did not consider the interview an "adversarial" proceeding requiring the presence of such an assistant.

Accordingly, Vance appeared in proper person, armed, however, with a written statement prepared by McNally that summarized his progress over the year, includ-

---

8. That would make the termination date September 22, 2002. The parties agree that

Vance actually remained in the Program until November 30, 2002.

ing his search for apartments and jobs as well as his cooperation with housing and case management services. Vance's interviewers were Charlotte Taylor, a social worker with Montgomery County, not affiliated with HOC, and Diana Bird, a social worker who was affiliated with HOC. At the hearing on the Motion for Preliminary Injunction, Taylor testified that she and Bird found Vance to be well-spoken and that they listened as he recounted his progress over the past year. Taylor also testified and Bird confirmed that, at the time of the reinstatement interview, there were 4 applicants for 3 vacancies in the Supportive Housing Program and that the 3 applicants other than Vance were deemed worthier than he. However, without providing a written explanation, HOC simply declined to reinstate him into the Program. At the hearing on the Preliminary Injunction, Taylor acknowledged that note had been taken of Vance's pattern of non-payment of rent, but stated that merely bringing his debt current would not have gotten him selected.

On October 22, 2002, Jennifer L. Berger, Esquire, an attorney from the Legal Aid Bureau who by that time had entered the case on behalf of Vance, wrote to HOC's counsel, Kenneth B. Tecler, Esquire, requesting Appeal Board hearings both as to Vance's termination and the subsequent denial of his reinstatement to the Program. Tecler, by letter dated October 30, 2002, denied both requests, suggesting that Vance had already had his due process hearing in June, 2001.

Vance thereafter moved to a temporary private apartment funded in part by the Montgomery Housing Partnership and the Montgomery County Rental Assistance Program. At the time of the Preliminary Injunction hearing, he was living in an apartment at 2300 Blueridge Avenue, Silver Spring, Maryland 20902. His monthly income consisted of $665.00 in social security benefits for disability, $178.00 added to those benefits on account of his son, $120.00 in food stamps, $250.00 from the Montgomery Housing Partnership, $200.00 from the County's Rental Assistance Program, $75.00 from Linkages to Learning and $545.00 in Supplemental Social Security Benefits for his son, a total of $2,033.00. However, as of the time of the Preliminary Injunction hearing, Vance had been advised that the SSI benefits for his son would be terminated, a decision that he was appealing.

Vance brought suit "because of the potential lapse in the Supplemental Security Income (SSI) and because of the uninhabitable conditions of his current temporary apartment," alleging that he and his son were facing imminent eviction and homelessness.

Against this background Vance alleged:

1) That his rights under the McKinney Supportive Housing Program had been violated, in that he was not afforded due process with regard to the termination decision and further because he was terminated for reasons not authorized by the statute, *i.e.* they were not "severe" in nature;

2) That he was denied Due Process of Law under the 14th Amendment in that he was not given a hearing to determine whether he violated the conditions of his probation before he was terminated from the Program, in which he had a protected property interest;

3) That his rights under the Fair Housing Act, 42 U.S.C. § 3601 *et. seq.*, were violated in that, as a handicapped individual, HOC refused to make reasonable accommodations to afford him an opportunity to be heard as to his termination, or to permit a representative to assist him at the

October 2002 reinstatement interview;

4) That his rights under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 24 C.F.R. § 8 *et. seq.* were violated in that HOC refused to make reasonable accommodations for his psychiatric disability to afford him an opportunity to be heard at the time of his termination or to permit a case management worker or attorney to represent him at the October 2002 reinstatement meeting; and in failing to provide an appeal in connection with the October 2002 denial of reinstatement;

5) That the individual Defendants abused their discretion in terminating him under circumstances that were not sufficiently "severe" and by not providing him a hearing in connection with the August 22, 2002 termination letter.

Vance sought preliminary relief to enjoin Defendants from terminating his participation in the McKinney VI Supportive Housing Program; require his reinstatement into the Program effective December 1, 2001; require HOC to render assistance with regard to his current rent; and require HOC's assistance with regard to any rent accrued as of the time he was evicted from his apartment in Silver Spring.

Defendants opposed all such requests.

### IV.

When ruling on a request for a preliminary injunction, the court considers the four factors set out in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 195 (4th Cir.1977):

1) The likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

2) The likelihood of harm to the defendant if the requested relief is granted;

3) The likelihood that the plaintiff will succeed on the merits, and

4) The public interest.

The court first balances the respective hardship to the parties, factors one and two, against one another, *see Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812–13 (4th Cir.1991), which then determines the extent to which the plaintiff must establish a likelihood of success on the merits. If the balance of harms "tips decidedly in favor of the plaintiff," the plaintiff need only "raise[ ] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* at 813 (internal quotation omitted). If the balance of harms is in equipoise or does not favor the plaintiff, the plaintiff must make a higher showing of his likelihood of success. *See id.*

### V.

Before embarking on a discussion of the *Blackwelder* factors as they applied here, the Court reviews the precise nature of the preliminary relief Vance sought. To be sure, he sought immediate reinstatement in the McKinney VI Supportive Housing Program as well as payment of his current rent and any rental arrearages due in connection with his prior housing. However, he also sought "such other and further relief as this Court deems that the nature of his cause may require." The Court understood, therefore, that Vance was also seeking, on a preliminary basis, restoration of the supportive services of the type provided under the Program, *e.g.* assistance in obtaining permanent housing and in obtaining other federal, state and local benefits available for such residents, including

medical assistance and mental health benefits. 42 U.S.C. § 11385(c)(D). Further, the Court understood that at a minimum Vance was seeking to be reinterviewed as soon as possible to determine his eligibility to participate in the Supportive Housing Program, so long as the interview might be conducted by two individuals who had no previous contact with his case and so long as he had the right to be accompanied to the interview by an individual of his choosing to help him advocate his position. Finally, the Court understood that at a minimum Vance sought to have a new Appeal Panel determine whether his termination from the Program in August 2001 was proper, again so long as the members of the Panel would not in any way have had any prior contact with his case and so long as he might have the right to appear before the Panel represented by counsel.

With this refinement in mind, the Court considered the *Blackwelder* factors.

■ Vance contended that if he was not immediately reinstated in the McKinney program, he and his son faced irreparable harm because they would be required to continue living in an uninhabitable apartment and would face the prospect of homelessness due to the imminent loss of the son's Supplemental Security Income.

HOC argued that it would suffer harm if required to reinstate Vance in the Program because, among other things, HOC has finite resources available to a fixed number of participants and no funds were immediately available to provide Vance the relief he was requesting. Accordingly, an immediate order of relief would unfairly impose costs on HOC. HOC also argued that any harm to Vance was speculative and in any case reparable. In the first place, it said, Vance's son had not lost his SSI benefits. Second, even if those benefits were terminated, Vance was receiving public assistance which could be adjusted

upward to reflect the loss of the SSI. Vance, moreover, should be required to exhaust all other forms of public assistance before seeking relief from the Court. Finally, HOC argued, even without SSI benefits, Vance did not face imminent homelessness because his landlord would have to follow an eviction scheme that includes judicial review by a local court.

Vance argued that HOC would not face harm if a preliminary injunction were granted because it administers at least nine McKinney Supportive Housing Programs through which it could support him.

The Court concluded that the balance of harms did not tip decidedly in favor of Vance. As of the date of the Preliminary Injunction hearing, he and his son were ensconced in an apartment, receiving income sufficient to cover their rent. No final decision had been made relative to his son's SSI benefits. HOC, moreover, was correct that Vance had access to other federal, state and local benefit programs and that those programs might well be available to substitute for any terminated SSI payments. At the same time, there was no indication that HOC possessed sufficient funds to simply add Vance back into the Program; indeed, immediate reinstatement of Vance might cause a diversion of funds from other needy participants, to their obvious detriment. The balance of hardships, therefore, appeared to be at best in equipoise or even slightly in favor of Defendants.

■ The Court then turned to the next *Blackwelder* factor—the likelihood that Vance would succeed on the merits. The Court concluded that as to some of his causes of action, his prospects were, at best, dim. The suggestion that he was discriminated against on the basis of his handicap seemed tenuous. The very program he participated in and sought to be

rejoined to was and is dedicated to serving individuals with handicaps. While Vance may indeed have suffered a violation of certain of his due process rights, as discussed *infra,* it was doubtful that any of the actions taken by HOC discriminated against him by reason of his psychiatric handicap. In short, as to his causes of action under the Fair Housing Act and the Rehabilitation Act, the Court concluded that Vance had limited likelihood of success.

On the other hand, as to Vance's other claims the Court determined that he had demonstrated a high likelihood of success on the merits. Bearing in mind that he is an individual with a psychiatric disability, indeed that the program he sought to participate in is dedicated to accommodating just such individuals, the Court proceeded on the assumption that Vance was entitled to appropriate solicitude with regard to his entitlement to and termination from receiving governmental benefits. Thus, while there was and is no doubt that HOC can terminate a participant from the Supporting Housing Program under proper circumstances, the fact remains that the participant is entitled to appropriate due process with regard to the termination.

This is where Vance's claims resonated with the Court.

The Court was guided by *Goldberg v. Kelly,* 397 U.S. 254, 261–62, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), in which the Supreme Court held that welfare benefits are a matter of statutory entitlement for persons qualified to receive them and that procedural due process applies to their termination. "[O]nly a pre-termination hearing provides the recipient with due process," 397 U.S. at 264, 90 S.Ct. 1011. While counsel need not be provided at the pre-termination hearing, "the recipient must be allowed to retain an attorney if he so desires." 397 U.S. at 270, 90 S.Ct. 1011.

"And, of course, an impartial decisionmaker is essential .... [P]rior involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decisionmaker. He should not, however, have participated in making the determination under review." *Id.* (internal citations omitted).

The termination of supportive housing benefits under McKinney–Vento, in the Court's view, easily equates to the termination of welfare benefits as in *Goldberg.* Here, as there, "(f)or qualified recipients, [the benefit] provides the means to obtain essential food, clothing, *housing* and medical care." 397 U.S. at 264, 90 S.Ct. 1011 (emphasis added). Here, as in *Goldberg:*

the crucial factor ... is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." *Id.* (emphasis in original)

The first matter that concerned the Court was the May 7, 2001, "termination" letter. ("[y]ou are being terminated from our program because of your continued noncompliance [with the rent requirement].") It announced the decision to terminate Vance before any hearing had been held. Instead of merely proposing his termination, the final determination of which would be made at a hearing, he was accorded a right to appeal from a termination decision that had already been made. This appeared to be directly contrary to *Goldberg,* which requires a hearing *before* termination.

Then there was the matter of counsel. Vance was advised that he could have the

assistance of counsel at the termination hearing. But while *Goldberg* did not require that HOC provide counsel for him, he was not told, despite the fact that he was by definition laboring under a psychiatric handicap and impecunious, where he might go to obtain legal assistance for free. He was not advised, for example, that he might seek assistance from the Legal Aid Bureau which, well after the decisive events in this case took place, in fact ended up representing him. This was, after all, an individual who had been receiving counseling on how to keep his financial affairs in order, how to seek employment and the like. The idea that, as of May–June, 2001, he might somehow discover on his own how to engage counsel to represent him *gratis* at the termination hearing seemed improbable. That he showed up at the termination hearing without legal assistance was therefore entirely understandable.

The June 1, 2001 hearing was also problematic. Looney and Kramer had drafted and sent Vance the May 7 termination letter. In it they had assured him that his hearing before the Appeal Board would be before two independent individuals not otherwise connected with the case. Yet, after Vance departed, Looney and Kramer remained behind with the two Appeal Panel members for purposes of clarifying the record, obviously in a manner not favorable to Vance. Looney and Kramer, moreover, rather than members of the Appeal Panel, became the draftsmen and signatories of the Panel's decision—the June 13, 2001 letter of termination/probation. Not only did Looney and Kramer's participation contradict the assurance that had been given Vance in the May 7 letter that two independent individuals would decide his appeal; their *ex parte* communication with the Panel after Vance departed raised serious due process concerns.[9]

The June 13 letter compounded the problem.[10] In the first place, it was not entirely clear from the letter what Vance's exact status was. He was terminated, but the termination would be rescinded if he could comply with conditions of probation. One might suppose, from a logical standpoint, that he would not be terminated but would instead be continued in the Program subject to termination should he fail to comply with the conditions of probation. Be that as it may, the indication in the letter was that Vance would be automatically terminated should he violate one of the conditions; in effect there would be no further hearing should he be deemed to

---

9. Apart from the Fourteenth Amendment, 24 CFR 583.300(i), dealing with the Supportive Housing Program, was also implicated. The regulation provides, in pertinent part:

> (i) *Termination of housing assistance.* The recipient may terminate assistance to a participant who violates program requirements. Recipients should terminate assistance only in the most severe cases. Recipients may resume assistance to a participant whose assistance was previously terminated. In terminating assistance to a participant, the recipient must provide a formal process that recognizes the rights of individuals receiving assistance to due process of law. This process, at a minimum, must consist of:

> (1) Written notice to the participant containing a clear statement of the reasons for termination;
> (2) *A review of the decision, in which the participant is given the opportunity to present written or oral objections before a person other than the person (or a subordinate of that person) who made or approved the termination decision;* and
> (3) Prompt written notice of the final decision to the participant.
> (emphasis added).

10. The letter was dated eight business days after the hearing, whereas the Appeals Procedure had indicated that the Panel would issue a written decision within five business days of the hearing.

have violated. Were that to occur, he could offer no explanation.

In fact that is precisely what occurred. Vance made payments in June and July, but missed his August payment and was automatically terminated. The letter dated August 22, 2001 (again signed by Looney and Kramer, not by the Panel members) said flatly that he was terminated for non-payment of rent. He was given no opportunity to explain why he missed the payment, despite the fact that he might have had a reason. Again the Court notes that management of his personal affairs had been one of Vance's continuing core problems.

The questionable process did not end there. When Vance was terminated from the Program effective September 22, 2001,[11] he was told by Looney that he could not reapply to the program for a year. But no regulation establishing such a prohibition was brought to the Court's attention; this was apparently something that Looney took it upon himself to declare. Moreover, even if the one-year prohibition was an established HOC policy, its length might well have been challengeable on constitutional or other grounds.[12]

Then came the reinstatement interview in October 2002, in which Vance was specifically denied the right to have someone accompany him and assist in the presentation of his case. This was followed by a denial of reinstatement, for which no formal reason given, followed by denial of any right of appeal from the denial of reinstatement.

The Court understands that a primary objective of the McKinney Supportive Housing Program is to make homeless in-dividuals, including those with psychiatric handicaps, more self-sufficient. Clearly at some point a non-compliant participant may be shown the door. But the Court returns once again to the fact of Vance's psychiatric condition. Due process, if not fair housing or disability law, entitled him to appropriate solicitude. He needed guidance on how to engage an attorney for free to assist at his termination hearing; how to challenge the *ex parte* access that his case workers had to the Appeal Panel; how to challenge the denial of his right to be heard when he violated his "probation;" how to challenge an arbitrary declaration that he could not reapply to the Program for a year; how he might insist on the right to have someone accompany him to help articulate his position at his reinstatement interview; and how he might challenge the decision of the interviewers not to reinstate him. If, for example, the basis of the denial of reinstatement was his unpaid arrearage, it might be supposed that Vance could be denied reinstatement indefinitely, even if he were somehow in good faith able to begin to reduce the arrearage in reasonable increments. *Quaere* whether a denial on that ground could withstand a due process challenge.

All these issues raised significant concerns as to which the Court was prepared to say Vance had a high likelihood of success. While the Court was not similarly prepared to say that Vance would likely prevail with regard to his ultimate reinstatement into the Supportive Housing Program, he unquestionably made a compelling argument as to the violation of his procedural rights.

---

**11.** As indicated, Vance actually remained in the program until November 30, 2001.

**12.** The Court notes that 24 C.F.R. 583–300(i), which provides that "(r)ecipients may resume assistance to a participant whose assistance was previously terminated," sets no minimum waiting period. See n. *9 supra*.

## VI.

■] As to the final *Blackwelder* factor, the public interest, Vance maintained that it was in the public interest "to promote the provision of supportive housing to homeless persons to enable them to live as independently as possible." *See* 42 U.S.C. § 11381. HOC countered that a preliminary injunction might harm homeless people not involved in this case by diverting resources away from them in order to accommodate Vance. Again, however, these formulations of the issue focused on whether the Court should order immediate reinstatement of Vance into the Supportive Housing Program. In the Court's view, the more proper focus from a public interest standpoint was and is the extent to which participants in the Supportive Housing Program should receive procedural due process if, as and when their participation in the program is to be involuntarily terminated. Viewed from that perspective, the Court found the public interest favoring Vance's position.

## VII.

■ On the record before it, the Court was not disposed to issue a preliminary injunction directing HOC to immediately reinstate Vance in the Supportive Housing Program or to pay his current or accrued rent. Resolution of those issues was properly deferred until the merits hearing.

The Court, however, took note of Vance's psychiatric disability, his unsteady employment history and his precarious financial situation. Because the Court realized it would not reach a hearing on the merits for some time, it concluded that an appropriate interim arrangement, which would create little financial burden on HOC, but would benefit Vance greatly, would be for HOC to provide him with appropriate support services, *e.g.* counseling relating to housing, employment, other governmental benefits and the like, for a reasonable amount of time each month, *i.e.* up to 5 hours. At the same time, the Court saw no reason why HOC could not immediately reinterview Vance to determine his eligibility to re-enter the Supportive Housing Program, so long as the interview was conducted by two individuals with no previous contact with his case and so long as Vance was given the right to be accompanied to the interview by an individual of his choosing to help him advocate his position.

Further, since it was virtually certain that the Court would order the relief at the merits stage, the Court saw no reason why a new Appeal Panel consisting of two qualified individuals could not be constituted to consider whether Vance's termination from the Supportive Housing Program in August 2001 was proper, so long as the two members of the Panel would have had no prior contact with the case and provided further that Vance would have the right to appear before the Appeal Panel represented by counsel and provided further that Looney and Kramer would not in any way participate in drafting or signing the Appeal Panel's decision, although they might otherwise appear, in the presence of Vance and/or his representative, to state their views.

The Court, therefore, ordered all the foregoing relief. To the extent that it did so, it GRANTED the Motion for Preliminary Injunction. In all other respects, it DENIED the Motion WITHOUT PREJUDICE.

An Order has already ISSUED in the case.