2022 IL App (1st) 210074-U

FOURTH DIVISION
June 30, 2022

No. 1-21-0074

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| NICOLE METCALF, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Nos. 19 CH 12372 |
| CHICAGO HOUSING AUTHORITY, | ) | 20 CH 1980 |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Raymond W. Mitchell, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Reversing in part the judgment of the circuit court and vacating in part the decision of the agency where the agency violated petitioner's procedural due process rights.

¶ 2    A participant family consisting of petitioner Nicole Metcalf (Metcalf) and Lee Ridgeway (Ridgeway), was provided housing assistance from respondent Chicago Housing Authority (CHA) pursuant to the Housing Choice Voucher Program. While Metcalf and Ridgeway were

receiving assistance, the CHA was notified that Ridgeway continually physically and verbally abused Metcalf and that Ridgeway had been arrested for allegedly abusing Metcalf at the family's subsidized unit. In response, the CHA issued a notice and subsequently an amended notice titled "Intent To Terminate—Participant," which stated that the CHA intended to terminate Ridgeway's participation in the voucher program.

¶ 3    After a hearing, a hearing officer terminated assistance to Metcalf and Ridgeway and declined to issue Metcalf a new housing voucher. The CHA adopted the hearing officer's decision and terminated assistance to Metcalf and Ridgeway. Metcalf and Ridgeway then filed separate petitions for writ of *certiorari*, asking the circuit court to conduct an administrative review and reverse the CHA's termination. The circuit court consolidated both matters and affirmed the CHA's termination.

¶ 4    Metcalf appealed,[1] arguing that the CHA violated her constitutional due process rights when the CHA failed to provide her notice and a hearing prior to terminating her assistance. For the following reasons, we reverse in part the judgment of the circuit court, vacate in part the decision of the CHA, and remand the matter to the CHA for further proceedings.

¶ 5                                    BACKGROUND

¶ 6                         The Housing Choice Voucher Program

¶ 7    Congress established the Housing Choice Voucher Program "for the purpose of aiding low-income families in obtaining a decent place to live." 42 U.S.C. § 1437f(a) (2018). Under this program, the Department of Housing and Urban Development (HUD) provides federal funding to state and local public housing agencies, such as the CHA, who in turn provide housing subsidies to eligible families. 24 C.F.R. § 982.1(a)(1) (2019). To administer the voucher

---

[1] Ridgeway did not appeal the circuit court's decision and is not a party in this case.

program, housing agencies must adopt an administrative plan consistent with HUD regulations. *Id.* § 982.54.

¶ 8     When a family is selected for the program, the housing agency issues the family a voucher, giving the family permission to search for a housing unit. *Id.* § 982.302(a). If the agency approves the family's selected housing unit, the agency will make a contract with the unit's landlord under which the family pays some of the rent and the agency pays the remainder. *Id.* §§ 982.1(a)(2), 982.302(b).

¶ 9                                   The Instant Case

¶ 10     Metcalf and Ridgeway in 2013 commenced a romantic relationship. Thereafter, in June 2017, the CHA determined that a participant family consisting of Metcalf and Ridgeway was eligible for the voucher program. The CHA issued the participant family a voucher, and Ridgeway signed the voucher as the "Family Representative." This voucher was issued on June 6, 2017, and the voucher's expiration date was September 4, 2017.

¶ 11     In January 2018, Metcalf and Ridgeway signed an application for continued eligibility in the voucher program. On the application under the section named "Family Composition," Ridgeway was listed as "Head of Household" and Metcalf was listed as "Co-Head." On the same day they signed this application, Ridgeway signed a document listing the "Family Obligations," or program rules that a participant family must follow. The Family Obligations prohibited families or family members from disturbing residents' health, safety, and right to peaceful enjoyment.

¶ 12     Then, according to the "Memo Review," or a record of communications between the participant family and the CHA, and in an entry dated October 26, 2018, Metcalf attended a "1 on 1 briefing" with the CHA. In its next entry, the Memo Review indicated that the CHA issued

Metcalf "[c]onfidential case moving papers." The Memo Review did not discuss the subject of the briefing or why the CHA issued Metcalf moving papers, but the parties agree that the CHA did so pursuant to Metcalf's domestic violence allegation as well as the Violence Against Women Act and the CHA's administrative plan, which are discussed below.

¶ 13    In addition, in the entry dated October 26, 2018, the Memo Review also stated the following: "Voucher Issued 10/19/2018" and "Expiration Date 2/16/2018." Neither the parties nor the record explains to whom this voucher was issued or why this voucher's expiration date preceded the issuance date. But we observe that, in a prior entry, the Memo Review indicated that a voucher was issued on "06/29/2018" and expired on "10/25/2018." We further observe that the June 6, 2017 voucher signed by Ridgeway expired approximately three months later. Therefore, the record demonstrates that CHA vouchers expire several months after being issued, and we presume that the Memo Review's listed expiration date for the October 19, 2018 voucher was a typographical error and that the expiration date for this voucher was actually "February 16, 2019." Moreover, since the note about the October 19, 2018 voucher was contained in the same entry noting Metcalf's "1 on 1 briefing," we further presume that the CHA issued this voucher to Metcalf in response to her domestic violence allegations.

¶ 14    In January 2019, the CHA issued a notice titled "Intent To Terminate—Participant" (ITT),[2] and in June 2019, the CHA issued an amended ITT notice, which the CHA mailed to the participant family's subsidized unit. The amended ITT notice was addressed to Lee Ridgeway and stated, "Dear Lee Ridgeway: This letter serves as notice that we are proposing termination of your participation in the [voucher program]." The letter noted violations committed only by Ridgeway: it stated that the CHA received information that Ridgeway continually abused

_____

[2] The original ITT notice does not appear in the record.

Metcalf at the subsidized unit as well as reports indicating that Ridgeway was arrested for alleged domestic battery of Metcalf. Further, the notice stated that the participant has the right to a hearing and may bring an attorney to that hearing. The record on appeal fails to indicate that Metcalf was aware of the notice or that the CHA sent Metcalf separate notice.

¶ 15    Only Ridgeway requested a hearing, and in July 2019, a hearing officer[3] presided over the proceeding. Ridgeway and a CHA attorney were present. At the hearing, the CHA attorney assumed the role of a prosecutor, presenting evidence and cross-examining Ridgeway and his witnesses. Ridgeway represented himself, presenting evidence and cross-examining the CHA's witnesses.

¶ 16    During its opening statement, the CHA reiterated that it believed that Ridgeway continually abused Metcalf at the subsidized unit. The CHA also stated it was proposing that "Mr. Ridgeway be terminated from the [voucher] program, and that the voucher be given to Ms. Metcalf."

¶ 17    The CHA had admitted into evidence the police report of Ridgeway's arrest. In the report's "Incident Narrative," it indicated that Metcalf alleged that Ridgeway pushed her to the ground and forced her head into a wall. In addition, in a section noting observed injuries, the report stated that Metcalf's forehead was bruised and swelling.

¶ 18    The CHA called Metcalf as a witness, who testified over the phone. The record fails to indicate how Metcalf was made aware of the hearing or how the CHA secured her as a witness. Metcalf testified that her relationship with Ridgeway was both mentally and emotionally

---

[3] Under the CHA's administrative plan, the CHA's "designated staff" serves as hearing officers. *Chicago Housing Authority Housing Choice Voucher Program Administrative Plan*, § 16-III.B. (eff. Feb. 1, 2019).

abusive. The hearing officer then asked Metcalf to provide specific examples of the abuse, and Metcalf testified that Ridgeway destroyed her things, screamed at her, and called her names.

¶ 19    Metcalf testified as to what occurred on the day Ridgeway was arrested. Metcalf asserted that Ridgeway was drinking alcohol, and later in the day, Ridgeway went into her closet and started "throwing stuff out." Metcalf further testified that, to stop him from damaging her possessions, she moved near Ridgeway and the closet door. Ridgeway then slammed the door against Metcalf's head. Metcalf called the police, but Ridgeway left the unit before the police arrived. After Metcalf filed a police report and the police left the unit, Ridgeway returned but had left his keys in the unit, so he started screaming and banging on the door and windows. The neighbors called the police, and the police returned and arrested him.

¶ 20    Metcalf testified that she failed to appear at a court hearing after Ridgeway's arrest, asserting that she received a notice informing her that the hearing would be conducted on November 6, 2018, but the hearing was actually "before the 5th."

¶ 21    Metcalf further testified that she moved out of the subsidized unit in February 2019. She asserted that she was homeless, stating that "I don't have anywhere to go" and that a friend was holding her possessions.

¶ 22    The CHA rested, and Ridgeway presented evidence. Ridgeway testified that he never abused Metcalf. Ridgeway also provided the hearing officer an arrest report he made in April 2019. Ridgeway testified that the report alleged that Metcalf swung a switchblade at him and cut his shirt. Ridgeway further testified that Metcalf still has keys to the unit, and as to her living situation, Ridgeway asserted "[t]he kid she staying with, they get into it over there because she come over to my house to lay here." When the hearing officer asked Ridgeway when she last stayed at the unit, Ridgeway asserted "[b]efore the 4th of July."

¶ 23    Ridgeway first called as a witness Keshia Moss, Ridgeway's niece. Keshia testified that Ridgeway treated Metcalf very well. Keshia further testified that when she, Ridgeway, and Metcalf lived at Keshia's grandmother's house, Metcalf believed she could "be in charge of the house" and that Keshia "let her know that that's not the case." Keshia stated that when she did so, Metcalf became upset with Keshia. Keshia also asserted that Ridgeway did not harm Metcalf and stated to Ridgeway that "if she was so afraid of you or didn't want to get around you, she had plenty of opportunities to leave. Plenty. She did not."

¶ 24    Ridgeway next called as a witness Kena Moss, who was also Ridgeway's niece. Kena testified that she was a social worker for Catholic Charities. Kena worked for the organization's homeless program, which assisted domestic violence victims. Kena thought that Metcalf was manipulative and testified that "I was going to help her until she was making up stories to get into our homeless program *** I found her to be a user of the system for people who actually need it." Kena asserted that when she realized that Metcalf was "a user of the system," she stopped discussing Catholic Charities, but because Metcalf was homeless, Kena provided Metcalf with a referral to the Illinois Department of Human Services. Kena further testified that Metcalf "did not want to do it the right way, so I was not about to finagle the system for her."

¶ 25    Kena recounted a conversation during which she and Metcalf discussed the Catholic Charities homeless program. Metcalf asked Kena how people are admitted into the program, and Kena answered that they must be escaping domestic violence. Kena asked Metcalf whether someone was abusing her, and Metcalf responded "no" and that she was "just wondering" because her friends had told her about the homeless program. Kena then told Metcalf that if she was not being abused, then Kena would not lie so that Metcalf could participate in the homeless program.

¶ 26    In its closing argument, the CHA again requested that the hearing officer uphold the CHA's proposals to "terminate Mr. Ridgeway and give the voucher to Ms. Metcalf."

¶ 27    The hearing officer issued a written decision. As to the witnesses' credibility, the hearing officer found that Ridgeway's testimony was "somewhat credible," Keshia's testimony was "credible," and Kena's testimony was "very credible." The hearing officer found that Metcalf's testimony was "vague."

¶ 28    The hearing officer then made the following findings of fact. She found that both Metcalf and Ridgeway contributed to disharmony in the unit and that Metcalf asked Kena whether she could get a housing voucher more quickly if she were found to be a victim of domestic violence. The hearing officer also found that on at least three occasions the police were called to the subsidized unit: when Metcalf reported that Ridgeway injured her, when Ridgeway was locked out and banging on the door and windows, and when Ridgeway reported that Metcalf brandished a knife and cut his shirt.

¶ 29    In the hearing officer's analysis, the hearing officer explained the requirements set forth in the Violence Against Women Act (VAWA) (34 U.S.C. § 12291 *et seq.* (2018)), which protects domestic violence victims participating in voucher programs. In addition, the hearing officer recited the CHA's policy that the CHA will terminate any family that violates the Family Obligations.

¶ 30    The hearing officer then found that there was insufficient evidence to support Metcalf's VAWA claim. Although the hearing officer was concerned that the police report indicated that Metcalf's forehead was bruised and swelling, the hearing officer noted Kena's testimony, which to the hearing officer suggested that Metcalf " 'created' the incident" of Ridgeway's alleged abuse of Metcalf "to further her goal to obtain housing." The hearing officer further noted that

Metcalf was absent at a court hearing after Ridgeway's arrest and found that Metcalf's testimony that she was either unaware of the date or provided the incorrect date "was not credible." The hearing officer also observed that Metcalf "continues to go to the subsidized unit and stay there."

¶ 31    In addition, the hearing officer found that the three instances in which the police were called provided evidence that both Metcalf and Ridgeway disturbed residents' right to peaceful enjoyment and thus violated the Family Obligations.

¶ 32    As stated above, the CHA made two proposals; the first was to "terminate Mr. Ridgeway" and the second was to "give the voucher to Ms. Metcalf." Since Ridgeway was issued the voucher as a member of the participant family, however, the CHA could only "terminate Mr. Ridgeway" by terminating the participant family's voucher, and the CHA could only "give the voucher to Ms. Metcalf" by issuing her an entirely new voucher. The hearing officer interpreted the CHA's first and second proposals as such. In her conclusion, the hearing officer found that Ridgeway and Metcalf violated the Family Obligations and therefore that the CHA's proposal "to terminate [housing] assistance to Mr. Ridgeway and Ms. Metcalf is upheld." Further, the hearing officer explicitly declined to issue Metcalf a new voucher since she violated the Family Obligations by disturbing residents' peaceful enjoyment. Then the CHA, bound by the hearing officer's decision (see *Chicago Housing Authority Housing Choice Voucher Program Administrative Plan*, § 16-III.B. (eff. Feb. 1, 2019)), terminated housing assistance to Ridgeway and Metcalf, and the CHA did not issue Metcalf a new voucher.

¶ 33    Metcalf and Ridgeway filed separate petitions for writ of *certiorari*, asking the circuit court to reverse the CHA's decision. The circuit court consolidated the matters. In support of her petition, Metcalf argued that constitutional due process and federal regulations required the CHA to provide her with written notice that her program participation was at risk of being terminated.

She asserted the amended ITT notice was addressed to Ridgeway and only discussed Ridgeway's behavior as grounds for the CHA's proposed termination. Metcalf also contended that the CHA denied her the opportunity to request a hearing to present evidence and cross-examine adverse witnesses.

¶ 34 In response, the CHA argued that HUD regulations required the CHA provide written notice and a hearing only to the participant family and that Metcalf was not entitled to separate notice or a hearing. The CHA stated that if Metcalf were entitled to separate notice and a hearing, then every member of a multi-person family could demand separate notice and a hearing. The CHA contended this would be an absurd result.

¶ 35 In a written decision, the circuit court found that federal regulations required the CHA to provide notice and a hearing only to the participant family and that the CHA did so in this instance. The circuit court concluded that Metcalf was not entitled to a separate hearing and notice. Accordingly, the circuit court affirmed the CHA's decision. This appeal followed.

¶ 36 ANALYSIS

¶ 37 On appeal, Metcalf argues that the CHA's termination violated her rights under the fourteenth amendment of the United States Constitution (U.S. Const., amend. XIV), the United States Housing Act (42 U.S.C. § 1437d(k)(1) (2018)), and its implementing regulations (24 C.F.R. § 982 *et seq.* (2019)), the CHA's administrative plan, and the VAWA (34 U.S.C. § 12291 *et seq.* (2018)). In addition, Metcalf contends that the CHA failed to consider all of the relevant circumstances and imposed too severe of a sanction. Finally, Metcalf argues that the CHA forfeited its arguments on administrative review. We find dispositive our resolution of whether the CHA violated Metcalf's procedural due process rights, and for the following reasons, we reverse in part the judgment of the circuit court, vacate the decision of the CHA to terminate

Metcalf's housing assistance, and remand the matter for further proceedings consistent with this order.

¶ 38                                    Standard of Review

¶ 39     The CHA operates under the Illinois Housing Authorities Act. 310 ILCS 10/1 *et seq.* (West 2018). When an agency's enabling statute does not adopt the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)) or provide any other method to review an agency's decision, a party may ask a circuit court to review the decision by filing a common law writ of *certiorari*. *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 333 (2009). Since the Illinois Housing Authorities Act did not adopt the Administrative Review Law or provide another method of review, filing a common law writ of *certiorari* is the proper procedure by which to request review of the CHA's decisions. *Landers v. Chicago Housing Authority*, 404 Ill. App. 3d 568, 571 (2010).

¶ 40     We review an appeal of a circuit court's ruling on a writ of *certiorari* "as we would any other appeal that comes to us on administrative review." *Tolliver v. Housing Authority of County of Cook*, 2017 IL App (1st) 153615, ¶ 20. In addition, we review the agency's decision and the record of administrative proceedings, not the circuit court's decision. *Lipscomb v. Housing Authority of County of Cook*, 2015 IL App (1st) 142793, ¶ 11.

¶ 41                                    Procedural Due Process

¶ 42     Metcalf argues that the CHA failed to provide her with written notice and a hearing and violated her due process rights under the fourteenth amendment of the United States Constitution (U.S. Const., amend. XIV). Whether Metcalf received due process is an issue we review *de novo*. See *Grimm v. Calica*, 2017 IL 120105, ¶ 18.

¶ 43                                    *Protectible Property Interest*

¶ 44     Metcalf argues that the CHA failed to provide her notice and a hearing and violated her

due process rights under the fourteenth amendment of the United States Constitution. The due

process clause of the fourteenth amendment protects against the deprivation of life, liberty, or

property without due process of law. U.S. Const., amend. XIV. Thus, we must first identify a

protectible property interest, because if there was no property interest, then no process was due.

See *Wilson v. Bishop*, 82 Ill. 2d 364, 368 (1980) (quoting *Polyvend, Inc. v. Puckorious*, 77 Ill. 2d

287, 293-94 (1979)).

¶ 45     The CHA acknowledges that it never provided Metcalf separate notice or a hearing. The

CHA argues, however, that it was never required to do so. The CHA asserts that the participant

family, not Metcalf individually, possessed a property interest in continued housing assistance,

and therefore, the CHA was only required to send notice and provide a hearing to the participant

family. In addition, neither party disputes that the CHA provided notice and a hearing to the

participant family. Thus, in resolving Metcalf's contention, we must first determine whether

Metcalf possessed a unique, protectible property interest entitling her to notice and a hearing.

¶ 46     The due process clause protects property interests that an individual has already acquired

in specific benefits. *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of

Chicago*, 2012 IL 112566, ¶ 12 (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564,

576 (1972)). To acquire a property interest in a specific benefit, one must have a legitimate claim

of entitlement, or legitimate expectation, to receive or continue receiving that benefit. *Polyvend*,

77 Ill. 2d at 293-94 (1979) (citing *Roth*, 408 U.S. at 577); *Ertl v. City of De Kalb*, 303 Ill. App.

3d 524, 526 (1999). Legitimate expectations may arise from statutes, contracts, or mutually

explicit understandings. *Chamberlain v. Civil Service Comm'n of Village of Gurnee*, 2014 IL

App (2d) 121251, ¶¶ 36, 39.

¶ 47    Since the issue of whether Metcalf acquired a unique property interest requires this court to consider federal constitutional principles, and since there is no Illinois case on point, we may consider federal case law for guidance. *Key v. Aurora Housing Authority*, 2020 IL App (2d) 190440, ¶ 11; *Marshal v. City of Chicago*, 408 Ill. App. 3d 817, 823 (2011). We find that *Pickett v. Housing Authority of Cook County*, 114 F. Supp. 3d 663 (N.D. Ill. 2015), offers guidance. In *Pickett*, a tenant received a voucher and located three different units during her housing search. *Id.* at 666. For reasons beyond the tenant's control, however, each unit's landlord refused to contract with the housing agency. *Id.* After the third landlord refused, the tenant requested an extension of her voucher, but the agency denied her request and terminated her housing assistance. *Id.* The tenant then brought a procedural due process claim against the housing agency, and it moved to dismiss the claim, arguing that the tenant no longer possessed a property interest because her voucher had expired. *Id.* at 665, 667. The district court concluded that the tenant possessed a property interest, finding that, even though the tenant's voucher had expired, the tenant had "a legitimate expectation of remaining in the program" since she did everything within her control to remain in the program and was otherwise in compliance with the agency's policies. *Id.* at 668, 670.

¶ 48    In the case at bar, after Metcalf alleged domestic violence, the CHA initiated the process to separate the participant family by holding a briefing with Metcalf and issuing her the October 19, 2018 voucher and moving papers. When the CHA issued Metcalf the voucher and moving papers in response to her domestic violence allegation, Metcalf acquired a "legitimate expectation of remaining in the program" apart from the participant family. See *Chamberlain*, 2014 IL App (2d) 121251, ¶¶ 36, 39; *Pickett*, 114 F. Supp. 3d at 670. Further, even though

Metcalf's voucher expired, she nevertheless retained a "legitimate expectation of remaining in the program," since she did everything within her control to remain in the program and was otherwise in compliance with the CHA's policies. See *Pickett*, 114 F. Supp. 3d at 670. Thus, we find that Metcalf possessed a "legitimate expectation of remaining in the program" apart from the participant family, and a unique, protectible property interest in continued housing assistance. See *Polyvend*, 77 Ill. 2d at 293-94 (citing *Roth*, 408 U.S. at 577); *Ertl*, 303 Ill. App. 3d at 526.

¶ 49                                     *Procedural Due Process Protections*

¶ 50     As Metcalf possessed a protectible property interest in continued housing assistance, the CHA was required to provide her with procedural due process protections before terminating her assistance. Specifically, the CHA was required to provide her with the following due process protections: (1) timely and adequate notice detailing the reasons for the proposed termination; (2) an opportunity to appear at a hearing, present evidence, and cross-examine adverse witnesses; (3) the right to be represented by counsel; (4) a right to a decision rendered by an impartial decision maker; (5) a right to have that decision based solely on rules of law and evidence presented at the hearing; and (6) a right to a statement by the decision maker setting forth the reasons for the decision and the evidence upon which it was based. See *Tolliver*, 2017 IL App (1st) 153615, ¶ 22 (citing *Goldberg v. Kelly*, 397 U.S. 254, 266-71 (1970)). Thus, when Ridgeway informed the hearing officer that Metcalf brandished a knife and presented testimony against Metcalf, the CHA was required to provide her these procedural due process protections before terminating her assistance on that basis. See *id.* The focus of the proceeding was to terminate Ridgeway's assistance and provide a voucher for Metcalf, but the hearing officer, without giving Metcalf an opportunity to defend herself, issued a decision terminating her assistance. See *id.*

¶ 51     The CHA failed to provide Metcalf with all the due process protections to which she was

entitled. First, the CHA failed to provide Metcalf with separate notice; it provided the amended ITT notice to the participant family's subsidized unit. Further, the notice also was addressed to Ridgeway and noted violations only committed by him. In addition, at the informal hearing, Metcalf was not provided an opportunity to appear on her own behalf, present evidence, or cross-examine Ridgeway's adverse witnesses. Nor was she provided the opportunity to be represented by counsel. Instead, Metcalf merely testified as a witness against Ridgeway. Thus, by failing to provide Metcalf with procedural due process protections before terminating her assistance, the CHA violated her due process rights. See *id.*

¶ 52      The CHA disputes that Metcalf possessed a unique property interest, arguing that "[t]here are no regulations or legal authority *** that dictate notice is to be provided to each separate individual in a household." Our finding that Metcalf possessed a property interest, however, would not require the CHA to provide notice, or a hearing, to each member of a participant family when the CHA proposes to terminate that family's assistance. Each member of a participant family does not possess a "legitimate expectation of remaining in the program" apart from the family; as stated above, Metcalf acquired a "legitimate expectation of remaining in the program" apart from the participant family only when the CHA issued her a voucher and moving papers in response to her domestic violence allegation. See *Chamberlain*, 2014 IL App (2d) 121251, ¶¶ 36, 39; *Pickett*, 114 F. Supp. 3d at 670. Thus, we are unpersuaded by the CHA's argument, and we find that, before terminating her housing assistance, the CHA was required to provide Metcalf with the procedural due process protections outlined above.

¶ 53                                    CONCLUSION

¶ 54      For the reasons stated above, we reverse that part of the judgment of the circuit court of Cook County affirming the termination of Metcalf's housing assistance, vacate the decision of

the CHA to terminate Metcalf's housing assistance, and remand the matter to the Chicago Housing Authority for further proceedings consistent with this order.

¶ 55     Circuit court judgment reversed in part; agency decision vacated in part; cause remanded.